OFFICE OF THE GOVERNOR *v.* SELECT COMMITTEE OF INQUIRY TO RECOMMEND WHETHER SUFFICIENT GROUNDS EXIST FOR THE HOUSE OF REPRESENTATIVES TO IMPEACH GOVERNOR JOHN G. ROWLAND PURSUANT TO ARTICLE NINTH OF THE STATE CONSTITUTION (SC 17211)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued June 18—officially released June 18, 2004

*Ross H. Garber*, with whom was *Melinda M. Decker*, for the appellant (plaintiff).

*Cynthia S. Arato*, pro hac vice, with whom were *Steven F. Reich*, pro hac vice, *Marc Isserles*, pro hac vice, and *Laura Jordan* and *Mary Anne O'Neill*, for the appellee (defendant).

*Opinion*

BORDEN, NORCOTT, KATZ, PALMER and VERTEFEUILLE, Js.[1] The principal issue in this ap-

---

[1] This opinion is the result of a collaborative effort by the members of the majority, namely, Justices Borden, Norcott, Katz, Palmer and Vertefeuille. Hence, it is issued as an opinion signed by all of those members of the court.

This appeal was argued on June 18, 2004, pursuant to an expedited briefing and argument schedule. Following oral argument, this court rendered its judgment on that date in the form of a truncated opinion, affirming the judgment of the trial court, and stating that a full opinion would follow in due course. *Office of the Governor* v. *Select Committee of Inquiry*, 269 Conn. 850, 853, 850 A.2d 181 (2004). Similarly, the two dissenting justices filed their dissent in equally truncated form, with a similar statement that

peal[2] is whether the plaintiff, the office of the governor of Connecticut,[3] John G. Rowland, is categorically immune, by virtue of the separation of powers provision

their full opinion would follow in due course. Id., 854. Hence, we issue this full majority opinion. Compare *State* v. *Blasko*, 202 Conn. 189, 520 A.2d 207 (1987) with *State* v. *Blasko*, 202 Conn. 541, 522 A.2d 753 (1987).

We note that, on June 21, 2004, Governor John G. Rowland publicly announced that he would resign the office of governor of the state of Connecticut, effective July 1, 2004, and that he has since done so. In addition, the defendant has discontinued its investigation into the matter. As we explain later in this opinion, however, because this opinion elaborates on the reasons underlying our judgment rendered on June 18, 2004, and because the case was not moot as of that date, it is appropriate to issue this opinion notwithstanding those intervening events.

[2] Following certification by the Chief Justice, the plaintiff filed this expedited, public interest appeal, pursuant to General Statutes § 52-265a, from the judgment of the trial court denying its motion to quash a subpoena and for injunctive relief.

General Statutes § 52-265a provides: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the Chief Justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a special session of the Supreme Court for the purpose of an immediate hearing upon the appeal.

"(d) The Chief Justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

[3] The plaintiff in the present case is the office of the governor of Connecticut, and not the governor himself. The governor did not bring or join the trial court proceedings or participate in this appeal. Nonetheless, we recognize that our decision in the present case affects the governor in his official capacity, in that, if the plaintiff were to prevail, the governor would not be required to comply with the subpoena and, if the defendant were to prevail, the governor would be required to comply therewith.

contained in article second of the constitution of Connecticut, as amended by article eighteen of the amendments,[4] from a subpoena issued by the defendant, the select committee of inquiry to recommend whether sufficient grounds exist for the House of Representatives to impeach Governor John G. Rowland pursuant to article ninth of the state constitution, to compel the governor to testify before the defendant in connection with its duties. The plaintiff claims that the subpoena is invalid because: (1) the separation of powers provision affords the governor categorical immunity from being compelled to testify, regarding the performance of his official duties, before the defendant; and (2) even if the governor is not categorically immune, this subpoena is inconsistent with the separation of powers provision. The defendant, in addition to responding to the plaintiff's claims on the merits, contends that both the trial court and this court lack subject matter jurisdiction over the plaintiff's challenge to the subpoena because it is: (1) barred under this court's decision in *Kinsella* v. *Jaekle*, 192 Conn. 704, 475 A.2d 243 (1984); (2) barred by the speech or debate clause contained in article third, § 15, of the constitution of Connecticut;[5] (3) premature; and (4) a nonjusticiable political question.

We reject the defendant's jurisdictional claims. We further conclude that: (1) the governor is not categorically immune from the legal obligation to testify pursu-

---

[4] The constitution of Connecticut, article second, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . ."

[5] The constitution of Connecticut, article third, § 15, provides: "The senators and representatives shall, in all cases of civil process, be privileged from arrest, during any session of the general assembly, and for four days before the commencement and after the termination of any session thereof. And for any speech or debate in either house, they shall not be questioned in any other place."

ant to this subpoena;[6] and (2) this subpoena is not inconsistent with the separation of powers provision of the state constitution. We therefore conclude that the trial court properly denied the plaintiff's motion to quash the subpoena and for injunctive relief.

The defendant is a select committee of the House of Representatives, authorized originally on January 26, 2004, by virtue of House Resolution No. 702, and continued thereafter by various House actions, "to conduct a comprehensive investigation relating to misconduct by Governor John G. Rowland, and submit its findings and recommendations to the House of Representatives, including whether sufficient grounds exist for the House to exercise its power to impeach Governor John G. Rowland pursuant to Article Ninth of the state constitution." On May 18, 2004, the defendant issued the subpoena in question in this case to the governor, ordering him to appear and testify before the defendant on June 8, 2004.[7] On May 27, 2004, the plaintiff filed the present

---

[6] As we explain later in this opinion, the defendant has stated that it has no intention to seek to *compel* the governor's testimony by way of a capias or contempt findings. Therefore, although the parties have framed the issue in terms of whether the governor is immune from compelled testimony, we think that the more appropriate question is whether the governor is categorically immune from the legal obligation to testify.

For purposes of this case, we draw the following distinction between *compelled* testimony and the *legal obligation* to testify. We view compelled testimony as testimony given because a refusal to do so may be followed by a capias, arrest and a citation for contempt, which may involve, at one stage or another, physical restraint and imprisonment. The defendant has eschewed any such consequences. The legal obligation to testify, by contrast, means just that; the governor is not immune by virtue of the separation of powers provision from complying with the subpoena by appearing and testifying, irrespective of the fact that a refusal to do so would be followed only by an article of impeachment or the drawing of adverse inferences, or both. Thus, the principle that emerges from this case is that the governor is legally obligated to comply with the subpoena even in the absence of the traditional enforcement mechanisms therefor.

[7] Although the subpoena originally specified June 7, 2004, as the date for the governor's testimony, that date subsequently was changed to June 8, 2004, at the request of the governor due to a scheduling conflict.

action in the trial court seeking to have the court quash the subpoena and for injunctive and declaratory relief. On June 1, 2004, that court issued a temporary stay of the subpoena until it could hear argument on the plaintiff's motion. On June 7, 2004, the trial court, after submission of briefs and oral argument, denied the plaintiff's motion in a written memorandum of decision. Following the trial court's decision, the plaintiff, representing that it intended to appeal from the court's judgment pursuant to General Statutes § 52-265a; see footnote 2 of this opinion; applied to the trial court for a stay of the subpoena until this court could hear and decide the appeal. The trial court stayed the subpoena until 5 p.m. on June 10, 2004, "to afford the plaintiff an opportunity to appeal." The trial court also ordered that "[a]ny further applications for stay must be directed to the . . . Supreme Court."

On June 8, 2004, the plaintiff filed an application with the Chief Justice for certification and immediate appeal to this court pursuant to General Statutes § 52-265a, and requested an order setting an expedited briefing schedule for the appeal. In connection therewith, the plaintiff also filed an application for a stay of the subpoena until this court rendered a decision on the appeal. On June 10, 2004, the defendant filed its response in this court, specifically consenting to the plaintiff's request for an expedited briefing and hearing schedule and for a stay pending the appeal, "because the [defendant] believes that the public interest will best be served by this action being resolved expeditiously and without additional litigation . . . ." On June 10, 2004, the Chief Justice granted the plaintiff's application for an immediate and expedited appeal pursuant to § 52-265a. Following a scheduling hearing in this court on that date, the Chief Justice set the matter down for oral argument at 10 a.m., on June 18, 2004, and this court continued the stay of the subpoena until 5 p.m., on June 18, 2004. This

court heard oral argument on the appeal on June 18, 2004, and, following the argument, rendered its judgment as previously described; see footnote 1 of this opinion; affirming the trial court's judgment, and vacating the stay, effective immediately.

Certain facts and procedural history are undisputed. On January 26, 2004, the state House of Representatives unanimously adopted House Resolution No. 702. That resolution authorized the creation of the defendant and ordered it "to conduct a comprehensive investigation relating to misconduct by Governor John G. Rowland, and submit its findings and recommendations to the House of Representatives, including whether sufficient grounds exist for the House to exercise its power to impeach Governor John G. Rowland pursuant to Article Ninth of the state constitution." More specifically, under that resolution, the defendant was charged with the responsibility "to review and investigate the facts or circumstances relating to misconduct of Governor John G. Rowland; and . . . submit to the House of Representatives its findings and recommendations in the form of a final report, including, if it concludes such action is warranted, articles of impeachment describing the acts or omissions with which Governor John G. Rowland is charged." Although the defendant initially was instructed to submit its final report "no later than April 14, 2004," that date was later extended to June 30, 2004. The resolution also specified that the defendant had "all the powers of any committee of the General Assembly under [General Statutes § 2-46]"[8] including the power

---

[8] General Statutes § 2-46 provides: "(a) The president of the Senate, the speaker of the House of Representatives, or a chairman of the whole, or of any committee of either house, of the General Assembly, or either of the chairmen of the Legislative Program Review and Investigations Committee shall have the power to compel the attendance and testimony of witnesses by subpoena and capias issued by any of them, require the production of any necessary books, papers or other documents and administer oaths to witnesses in any case under their examination including any program review or investigation, as defined in section 2-53d. Any person, summoned as a

"to compel the attendance and testimony of witnesses by subpoena."

Following its inception, the defendant commenced an impeachment investigation pursuant to its authorizing resolution. It subpoenaed numerous witnesses for documents and deposed numerous persons. Other potential witnesses refused either to testify or to produce documents, invoking their constitutional privilege against self-incrimination. The defendant issued a subpoena duces tecum to the governor for numerous documents, to which neither the plaintiff nor the governor objected. Ultimately, the defendant issued the subpoena that is the subject of the present case, and the trial court proceedings and this appeal followed.

## I

We first address several issues regarding questions of mootness and justiciability relating to this appeal and the trial court's ruling, because they implicate both this court's and the trial court's subject matter jurisdiction. We conclude that the appeal is not moot, and that the matter is justiciable.

## A

### Mootness

The first question concerning the mootness of this appeal derives from the defendant's obligation to report

witness by the authority of either house of the General Assembly or said Legislative Program Review and Investigations Committee to give testimony or to produce books, papers or other documents upon any matter under inquiry before either house, or any committee of either house, of the General Assembly, or a joint committee of both houses, who wilfully makes default or, having appeared, refuses to be sworn or to answer any question pertinent to the question under inquiry, shall be fined not more than one thousand dollars nor less than one hundred dollars and imprisoned for not less than one month nor more than twelve months.

"(b) Any individual who is subpoenaed to appear and testify before a committee of the General Assembly or the Legislative Program Review and Investigations Committee shall have the right to review a copy of the transcript of his or her testimony and a reasonable amount of time to

its findings and recommendations to the House of Representatives on or before June 30, 2004. Accordingly, at the scheduling hearing before this court on June 10, 2004, we raised the question of whether, depending on the dates on which we heard and ultimately decided this appeal, it would be moot, because by that point the defendant would have closed its investigative proceedings or perhaps issued its final report to the House of Representatives. Ultimately, however, the defendant at that hearing represented to this court that, if we were to hear the appeal on June 18, 2004, its proceedings would still be open as of that date, so that, as of that date, the case would not be moot.

Accordingly, on June 18, 2004, we heard and decided the present appeal. Because at that time the defendant was still in session, any question of mootness by operation of the passage of time, which might have occurred had this appeal been heard and decided at a later date, had been dispelled. The appeal, therefore, is not moot by virtue of the defendant's time frame for reporting to the House of Representatives.

Also at the June 10 hearing, however, the defendant represented to us that, although it intended to invoke neither the capias nor the penal provisions of § 2-46 in the event that the governor refused to comply with the subpoena,[9] and that it did not intend to seek contempt proceedings in that event, it was retaining the option of making the governor's noncompliance a ground for an article of impeachment on the basis of an alleged obstruction by the governor of the defendant's responsibilities. This factual scenario raises a second question concerning mootness because, if there would be no

question its accuracy prior to the public release of said transcript or its permanent filing."

[9] Section 2-46 provides for a capias, and for fines and imprisonment in the event of specified failures to comply with a subpoena issued pursuant to it. See footnote 8 of this opinion for the text of § 2-46.

consequence of the governor's failure to comply with the subpoena, a decision of this court could not afford the plaintiff any practical relief and, therefore, the case would be moot. See *Williams* v. *Ragaglia*, 261 Conn. 219, 225, 802 A.2d 778 (2002) ("[w]hen, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot" [internal quotation marks omitted]). We conclude, nonetheless, that the appeal is not moot because of the collateral consequence of the potential for an article of impeachment on the basis, at least in part, of the governor's noncompliance with the subpoena. See id., 226 ("despite developments during the pendency of an appeal that would otherwise render a claim moot, the court may retain jurisdiction when a litigant shows that there is a reasonable possibility that prejudicial collateral consequences will occur" [internal quotation marks omitted]).

B

Justiciability

Having concluded that this appeal is not moot, we now consider the defendant's various other claims regarding subject matter jurisdiction.[10] The defendant claims that neither the trial court nor this court possesses subject matter jurisdiction because: (1) judicial review of this matter is precluded by our decision in *Kinsella* v. *Jaekle*, supra, 192 Conn. 723, wherein we concluded that judicial review of controversies arising

---

[10] In its supplemental brief filed with this court, the plaintiff contends that we should not reach the defendant's jurisdictional claims because they have not been preserved properly for appeal. This claim of waiver lacks merit. As we consistently have stated, the subject matter jurisdiction of a court addresses the fundamental competency of that court to operate as adjudicator, and such claims therefore may be made by any party at any time, or may be raised by the court sua sponte. *ABC, LLC* v. *State Ethics Commission*, 264 Conn. 812, 822–23, 826 A.2d 1077 (2003).

out of impeachment proceedings is confined to instances in which either the challenged legislative conduct clearly exceeded the scope of the House of Representatives' constitutionally conferred impeachment authority; see Conn. Const., art. IX, §§ 1 through 3;[11] or an egregious and otherwise irreparable violation of state or federal constitutional guarantees is being or has been committed in relation to the impeachment proceedings; (2) the defendant's issuance of the subpoena, in the exercise of the House of Representatives' constitutional impeachment authority, is immune from judicial review pursuant to the speech or debate clause contained in our state constitution; Conn. Const., art. III, § 15; see footnote 5 of this opinion; (3) the plaintiff's constitutional challenge to the defendant's issuance of the subpoena is nonjusticiable because it is not yet ripe for judicial resolution; and (4) the plaintiff's constitutional challenge presents a nonjusticiable political question with which the judiciary may not interfere. We conclude that the trial court had subject matter jurisdiction in the first instance, and that we possess subject matter jurisdiction on appeal, over the plaintiff's challenge to the defendant's issuance of the subpoena.

1

## Judicial Review of the Legislature's Impeachment Authority

The defendant claims that subject matter jurisdiction is lacking because, pursuant to our decision in *Kinsella*

[11] The constitution of Connecticut, article ninth, § 1, provides: "The house of representatives shall have the sole power of impeaching."

The constitution of Connecticut, article ninth, § 2, provides: "All impeachments shall be tried by the senate. When sitting for that purpose, they shall be on oath or affirmation. No person shall be convicted without the concurrence of at least two-thirds of the members present. When the governor is impeached, the chief justice shall preside."

The constitution of Connecticut, article ninth, § 3, provides in relevant part: "The governor, and all other executive and judicial officers, shall be liable to impeachment; but judgments in such cases shall not extend further

v. *Jaekle*, supra, 192 Conn. 723, judicial review of controversies arising out of impeachment proceedings is limited to instances in which the "legislature's action is clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer . . . or egregious and otherwise irreparable violations of state or federal constitutional guarantees are being or have been committed by such proceedings." (Citation omitted.) In the defendant's view, its issuance of the subpoena to the governor, occurring in the course of a duly constituted investigative inquiry into whether impeachment proceedings against the governor should be commenced, does not fall within either of these bases authorizing judicial review of legislative conduct related to impeachments. Because *Kinsella* involved facts and claims markedly different from the present case, we conclude that the legislature's jurisdiction over impeachments does not preclude judicial review of this matter.

We are mindful that this court's decision in *Kinsella* represents, prior to today, the only time that we have had occasion to interpret the impeachment provisions of our state constitution; Conn. Const., art. IX, §§ 1 through 3; as they relate to our subject matter jurisdiction over controversies arising out of impeachment proceedings. Thus, the teachings of *Kinsella* inform our analysis of the issues presented in this appeal. In *Kinsella* v. *Jaekle*, supra, 192 Conn. 707–708, the council on probate judicial conduct, following a statutorily authorized investigation, issued its recommendation that the plaintiff, James H. Kinsella, the elected judge of the Hartford Probate Court, be censured publicly for his conduct in connection with certain matters over which he had presided. Despite the council's decision not to recommend impeachment to the House of Repre-

---

than to removal from office, and disqualification to hold any office of honor, trust or profit under the state. . . ."

sentatives, the House nonetheless created a select committee (Kinsella committee) for the purpose of considering whether impeachment proceedings against Judge Kinsella should be undertaken. Id., 708.

As the Kinsella committee began its work, Judge Kinsella commenced an action in the Superior Court, seeking to enjoin its activities on the ground that the proceedings violated his state and federal constitutional rights to due process of law. Id. In connection with that litigation, Judge Kinsella issued subpoenas to the defendants, two cochairmen of the Kinsella committee (cochairmen). Id. The cochairmen moved to quash the subpoenas, claiming that the legislature had been conferred with exclusive authority over impeachment proceedings and that the trial court lacked subject matter jurisdiction over the controversy and, further, that they enjoyed immunity from compulsory testimony pursuant to the speech or debate clause of the state constitution. Id., 708–709.

After the trial court rejected the cochairmen's claims of jurisdictional infirmity, they appealed to this court and we consolidated that appeal with our consideration of certain other questions of law regarding the ongoing litigation that had been reserved for the advice of this court by the trial court. Id., 709–11. On appeal, this court concluded that the trial court had lacked subject matter jurisdiction over Judge Kinsella's complaint because our state constitution had provided the legislature with exclusive jurisdiction over certain aspects of impeachment proceedings and Judge Kinsella's challenge was directed toward legislative conduct within the exclusive jurisdiction of that body. Id., 711.

In reaching that decision, this court recognized two instances in which judicial review of controversies arising out of impeachment proceedings would be appropriate: (1) the legislative action was clearly outside the

confines of its constitutional impeachment authority; and (2) egregious and otherwise irreparable violations of state or federal constitutional guarantees were being or had been committed. Id., 723. We then rejected Judge Kinsella's contention that jurisdiction existed pursuant to the first basis authorizing judicial review because the legislative conduct at issue—an investigative inquiry into whether impeachment proceedings should be commenced—was "within [the legislature's] constitutional jurisdiction under the impeachment [provisions]." Id., 726. We further concluded that Judge Kinsella's claim failed as to the second basis authorizing judicial review because he had not been, nor was he being, subjected to egregious and otherwise irreparable violations of state or federal constitutional guarantees. Id. Rather, we determined that Judge Kinsella's allegations, namely, that the Kinsella committee's failure to define impeachable conduct and its failure to articulate a set of governing procedures for the impeachment proceedings deprived Judge Kinsella of due process of law, were entirely speculative. Id., 731. Specifically, we concluded that Judge Kinsella would suffer a violation of his due process rights "only if he is impeached and convicted of any charges and then only if the Senate had failed to define properly the scope of conduct that the constitution warrants as impeachable or had failed to provide procedures that ensure a fair determination of that question commensurate with the constitutionally protected interests at stake." Id. We refused to speculate that the legislature would conduct itself in a manner inconsistent with constitutional precepts, instead presuming that the legislature would exercise its impeachment authority with due respect for our constitution. Id., 729.

Although we concluded that judicial review was unauthorized in *Kinsella*, the standard that we announced recognized that the legislative impeachment authority coexists with the principle of judicial review,

and that our constitutional framework legitimates judicial review of impeachment proceedings in certain scenarios. In fact, we expressly rejected the "extreme position" advanced by the cochairmen that the legislature's impeachment authority should be construed to mean that it could take any action "no matter how outrageous, abusive, or illegal . . . without even the possibility of judicial review." Id., 726. The legislative impeachment authority instead remains bridled by our constitution, we explained, and "[i]f the legislature [should] attempt to encroach upon constitutional restrictions, it will become the solemn duty of the court to declare such an attempt illegal and the act void." (Internal quotation marks omitted.) Id., 727.

Turning to the present appeal, we now are called upon to consider a set of circumstances markedly different from the factual and legal focuses of *Kinsella.* Accordingly, although we reaffirm *Kinsella* within its analytical context, we recast, for application in the present case, the standard by which we consider the extent to which judicial review of impeachment proceedings against a sitting governor is authorized by our constitutional structure. More particularly, two factors compel our reformulation of the *Kinsella* standard: (1) the status of the party challenging the legislature's exercise of its impeachment authority; and (2) the nature of the constitutional challenge being raised.

With regard to the first factor, our state constitution confers upon the legislature the impeachment authority over "[t]he governor, and all other executive and judicial officers . . . ." Conn. Const., art. IX, § 3. Although the legislative impeachment authority therefore extends by its plain terms to all executive and judicial officials, our constitution treats the exercise of the impeachment authority, as against the governor, uniquely. Specifically, the constitution of Connecticut, article fourth, § 18 (b), as amended by article twenty-

two of the amendments, provides that, upon present-ment of articles of impeachment by the House of Repre-sentatives, "the lieutenant-governor shall exercise the powers and authority and perform the duties apper-taining to the office of governor until . . . the governor . . . is acquitted" by the Senate. Should the governor be convicted by the Senate, our constitution provides that the lieutenant governor thereafter shall take the oath of office of the governor and shall "be governor of the state until another is chosen at the next regular election for governor and is duly qualified." Conn. Const., amend. XXII (a). Further distinguishing impeachment of the governor, the constitution of Con-necticut, article ninth, § 2, provides in relevant part: "When the governor is impeached, the chief justice shall preside."

Under our constitutional scheme, the governor is the only official removed, albeit temporarily, upon the pre-sentment of articles of impeachment by the House of Representatives and during the pendency of the Senate trial. For all other officials, removal from office takes place only after a trial in the Senate and conviction by that body. This distinction means that the initial impairment of the capacity to execute the duties of the office of governor takes place in the impeachment process one critical step *before* the point at which all other executive and judicial officials are impaired in the performance of their duties by means of removal from office, namely, at the point of formal *accusation* by the House, as opposed to the point of conviction by the Senate.

Although impairment does remain contingent upon presentment of articles of impeachment by the House of Representatives, the proximity and severity of this harm as compared to the potential impairment for all other executive and judicial officials suggests that, in order to be afforded a meaningful opportunity to chal-

lenge legislative conduct related to gubernatorial impeachment proceedings, the office of a sitting governor should be allowed to raise its constitutional challenge under a somewhat more lenient standard than might apply to other officers who are subject to impeachment. Affording the office of a sitting governor the opportunity to bring a meaningful challenge to impeachment proceedings is especially critical because the presentment of articles of impeachment to the Senate has the immediate, and irreparable, effect of removing a duly elected official from office and depriving the people of the state, for a time, of the services of the governor whom they chose to fill that high office in the previous election. These consequences demonstrate the necessity that the plaintiff be afforded a reasonable opportunity to raise a meaningful constitutional challenge while the matter is before the defendant, whose task is vital to the ultimate decision as to whether articles of impeachment will be presented.

With regard to the second factor in *Kinsella*, we are mindful that, in that case, Judge Kinsella's constitutional challenge to the legislative conduct was based on the procedural components of the due process clauses of the federal and state constitutions. As we indicated in that case, such a claim, by its very nature, could have passed from the realm of speculation to tangible harm only upon Judge Kinsella's conviction in the Senate following a procedurally infirm trial, and we were unwilling to assume that either the House or the Senate would comport itself in that manner. *Kinsella* v. *Jaekle*, supra, 192 Conn. 731.

By contrast, the plaintiff in the present case has advanced a constitutional challenge based upon the separation of powers. We long have recognized that the separation of powers "is one of the fundamental principles of the American and Connecticut constitutional systems." *Stolberg* v. *Caldwell*, 175 Conn. 586,

598, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981); see also Conn. Const., amend. XVIII ("[t]he powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another"). As expressed by Chief Justice Warren Burger in his concurring opinion, "[t]he essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 760–61, 102 S. Ct. 2690, 73 L. Ed. 2d 349 (1982).

Unlike many other constitutional guarantees, violations of which require a showing of harm in order to entitle the victim of the violation to relief, a breach of the separation of powers principle is, contemporaneously, a constitutional violation *and* a tangible harm. In other words, action by one branch of government that violates the separation of powers is, in and of itself, a harm, in that the branch whose sphere of authority has been encroached upon has remained neither independent nor free from the risk of control, interference or intimidation by other branches. Id. In the present case, that violation occurred, if at all, when the defendant sought to require the governor to provide testimony, by its issuance of the subpoena in connection with its stated intent to recommend an article of impeachment or the drawing of adverse inferences, or both, upon the governor's failure to comply therewith. It was at *that* time that, if the subpoena had been so issued in violation of the constitution, the plaintiff's independent function within the executive branch was compromised.

In sum, taking into account the impeachment authority that has been constitutionally conferred upon the legislature, the historical development discussed in *Kinsella* v. *Jaekle*, supra, 192 Conn. 714–21, the vital principle of judicial review and with due regard for the principle of the separation of powers, we conclude that the appropriate standard by which to determine whether judicial review of the legislative exercise of the impeachment authority in connection with a sitting governor is warranted is whether the plaintiff has asserted, in good faith, a colorable claim of a constitutional violation. The striking of this balance, expresses due regard for both the legislative impeachment authority and the plaintiff's interest in raising a meaningful challenge to impeachment proceedings prior to the point of irreparability, that is, upon the presentment of articles of impeachment to the Senate. Applying this standard, we conclude that the plaintiff has asserted, in good faith, a colorable claim of a constitutional violation and that we, as did the trial court, have subject matter jurisdiction over this matter with regard to: (1) the plaintiff's claim that, by seeking to compel the governor's testimony, the defendant compromised the independent function of the executive branch; and (2) the defendant's claim of exclusive legislative jurisdiction over its issuance of the subpoena to the governor.

2

The Speech or Debate Clause of the State Constitution

The defendant next claims, pursuant to the speech or debate clause of our state constitution; Conn. Const., art. III, § 15; see footnote 5 of this opinion; that the constitutional validity of its issuance of the subpoena to the governor is immune from judicial review. We disagree with the defendant and conclude that our speech or debate clause does not immunize from judicial review a colorable constitutional claim, made in

good faith, that the legislature has violated the separation of powers by exceeding the bounds of its impeachment authority and, therefore, has conducted itself outside the sphere of legitimate legislative activity.

Our appellate courts previously have not had occasion to consider the meaning of our state constitution's speech or debate clause. We are not without guidance, however, as to the contours of that clause because this provision closely resembles the speech or debate clause contained in article one, § 6, of the constitution of the United States, which has been interpreted on several occasions by the federal courts, including the United States Supreme Court. We therefore seek guidance, as we often do in the interpretation of provisions of our state constitution, from the interpretation afforded the federal speech or debate clause by the federal courts. See, e.g., *State* v. *Rizzo*, 266 Conn. 171, 206, 833 A.2d 363 (2003); *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992).

The federal speech or debate clause finds its origins in a textually similar provision within the English Bill of Rights of 1689.[12] *Tenney* v. *Brandhove*, 341 U.S. 367, 372, 71 S. Ct. 783, 95 L. Ed. 1019 (1951). As the United States Supreme Court has indicated, the design of the federal speech or debate clause is to ensure that the legislative branch will be able to discharge its duties free from undue external interference. *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 502, 95 S. Ct. 1813, 44 L. Ed. 2d 324 (1975). A member of the constitu-

---

[12] "In 1689, the English Bill of Rights declared in unequivocal language: That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." (Internal quotation marks omitted.) *Tenney* v. *Brandhove*, 341 U.S. 367, 372, 71 S. Ct. 783, 95 L. Ed. 1019 (1951), quoting 1 Wm. & Mary, Sess. 2, c. II. Prior to the adoption of the federal constitution, Maryland, Massachusetts and New Hampshire, had already adopted a similar privilege within their own state constitutions. *Tenney* v. *Brandhove*, supra, 373–74.

tional convention, James Wilson, explained: "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense." (Internal quotation marks omitted.) 3 C. Antieau & W. Rich, Modern Constitutional Law: The States and the Federal Government (2d Ed. 1997) § 46.04, p. 384, quoting II Works of James Wilson (Andrews ed., 1896) p. 38.

Accordingly, the federal speech or debate clause has been viewed as a grant of immunity upon Congress in order "to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States* v. *Johnson,* 383 U.S. 169, 181, 86 S. Ct. 749, 15 L. Ed. 2d 681 (1966). The clause operates to protect legislative independence, thereby buttressing the principle of the separation of powers and preserving the structural integrity of our constitutional government. See *United States* v. *Brewster,* 408 U.S. 501, 507, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972); *United States* v. *Johnson,* supra, 178.

In order to effectuate the important considerations underlying the federal speech or debate clause, the United States Supreme Court has voiced a willingness to interpret the immunity afforded by the clause generously, on the basis of a "practical rather than a strictly literal reading" of the provision. *Hutchinson* v. *Proxmire,* 443 U.S. 111, 124, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979). The clause has been construed to provide "protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch." *Eastland* v. *United States Servicemen's Fund,* supra, 421 U.S. 502–503. Moreover, the immunity conferred by the fed-

eral speech or debate clause has been held to consist of not just immunity from liability, but immunity from suit. *Dombrowski* v. *Eastland*, 387 U.S. 82, 85, 87 S. Ct. 1425, 18 L. Ed. 2d 577 (1967) (per curiam).

Although, as the text of the provision demonstrates, the core protection afforded by the federal speech or debate clause regards speech or debate exchanged on the floor of the legislative body; *Gravel* v. *United States*, 408 U.S. 606, 625, 92 S. Ct. 2614, 33 L. Ed. 2d 583 (1972) ("[t]he heart of the [c]lause is speech or debate in either House"); the clause has been extended to cover a wide variety of legislative conduct, for instance: to protect voting; *Kilbourn* v. *Thompson*, 103 U.S. 168, 202, 204, 26 L. Ed. 377 (1881); the circulation of information to other legislators; see *Doe* v. *McMillan*, 412 U.S. 306, 312, 93 S. Ct. 2018, 36 L. Ed. 2d 912 (1973); and participation in the work of legislative committees. *Gravel* v. *United States*, supra, 624.

The federal speech or debate clause has not been construed, however, as a limitless conferral of absolute immunity. It has been held to immunize congressional aides; see id., 618 (congressional aides are protected by clause "insofar as [their] conduct . . . would be a protected legislative act if performed by the [m]ember himself"); but not to provide protection for legislative employees carrying out legislative orders, even if the clause would protect the congresspersons who had issued the directive. *Powell* v. *McCormack*, 395 U.S. 486, 505–506, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969); *Kilbourn* v. *Thompson*, supra, 103 U.S. 196–200.

In addition, the United States Supreme Court has drawn a distinction between "legislative" activities protected by the clause, and certain other "political" activities left unprotected by the clause. *United States* v. *Brewster*, supra, 408 U.S. 512 (concluding that activities related to functioning of legislative process are pro-

tected although essentially political activities, even if legitimate, are unprotected). As the United States Supreme Court explained in *Gravel* v. *United States*, supra, 408 U.S. 625, "[l]egislative acts are not all-encompassing. The heart of the [c]lause is speech or debate in either House. Insofar as the [c]lause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which [m]embers participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the [c]onstitution places within the jurisdiction of either House." One commentator has explained: "Unprotected political matters include providing constituent services, aiding individuals seeking government contracts and arranging appointments with government agencies, as well as communicating directly with the public through such media as constituent newsletters, press releases, speeches delivered outside of Congress, and book publishing . . . even if the material published was previously communicated in the course of protected legislative activity." L. Tribe, American Constitutional Law (2d Ed. 1988) § 5-18, pp. 371–72. Moreover, even for conduct within the penumbra of legislative activities, the immunity conferred by the federal speech or debate clause is limited to conduct occurring "within the sphere of legitimate legislative activity." (Internal quotation marks omitted.) *Gravel* v. *United States*, supra, 624; see *Eastland* v. *United States Servicemen's Fund*, supra, 421 U.S. 503 ("[w]e reaffirm that once it is determined that [m]embers [of Congress] are acting within the 'legitimate legislative sphere' the . . . [c]lause is an absolute bar to interference"); see also *Tenney* v. *Brandhove*, supra, 341 U.S. 376–77. "In determining whether particular activities other than literal speech or debate fall within the legitimate legislative sphere we look to see whether the activities took

place in a session of the House by one of its members in relation to the business before it. . . . More specifically, we must determine whether the activities are an integral part of the deliberative and communicative processes by which [m]embers participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the [c]onstitution places within the jurisdiction of either House." (Citation omitted; internal quotation marks omitted.) *Eastland v. United States Servicemen's Fund*, supra, 503–504.

With that backdrop in mind, just as in the case of justiciability under *Kinsella*, we must determine whether the plaintiff has raised a good faith, colorable claim that the defendant's issuance of the subpoena was outside the sphere of legitimate legislative activity such that the defendant is not shielded from suit by the speech or debate clause. As we discuss more fully in part II A of this opinion, an investigative power, encompassing the subpoenaing of persons and documents and the taking of testimony under oath, is a necessary and proper authority implicitly conferred by our state constitution in granting the legislature its jurisdiction over impeachments. The impeachment authority would mean little if it did not include the power to investigate. We conclude that the immunity conferred by the speech or debate clause, however, does not extend to a colorable claim, brought in good faith, that the legislature has conducted itself in violation of the principle of the separation of powers during the exercise of its impeachment authority.

We reach this conclusion for the following reasons. First, it is important to note that the speech or debate clause is itself part of article third of our constitution, governing the powers of the legislative branch. It cannot be viewed, therefore, as categorically trumping the separation of powers provision, which forms the very struc-

ture of our constitutional order and which governs, therefore, all three coordinate branches of government.

Second, as discussed with relation to the federal speech or debate clause, the primary purpose of the speech or debate clause, whether on a federal or state constitutional level, is to protect legislative independence, thereby furthering the principle of the separation of powers. It would be paradoxical to allow the clause to be used in a manner that categorically forecloses judicial inquiry into whether the legislature itself violated the separation of powers. Permitting the shield to extend that far would allow the clause to swallow the very principle that it seeks to advance. The clause is designed to protect legislative independence, not to install legislative supremacy.

Third, this construction is in harmony with our decision in *Kinsella*, and with several decisions of the United States Supreme Court interpreting the federal speech or debate clause. These cases collectively recognize that, however broad the legislative prerogative regarding impeachments may be, there are limits, and judicial review must be available in instances in which the impeaching authority has been exceeded. As we stated in *Kinsella*, "[i]f the legislature [should] attempt to encroach upon constitutional restrictions, it will become the solemn duty of the court to declare such an attempt illegal and the act void." (Internal quotation marks omitted.) *Kinsella* v. *Jaekle*, supra, 192 Conn. 727; see also *United States* v. *Brewster*, supra, 408 U.S. 515 ("[i]n no case has this [c]ourt ever treated the [c]lause as protecting all conduct *relating* to the legislative process" [emphasis in original]); *Powell* v. *McCormack*, supra, 395 U.S. 503 ("[l]egislative immunity does not, of course, bar all judicial review of legislative acts").

We are not persuaded by the defendant's reliance on *Eastland* v. *United States Servicemen's Fund*, supra,

421 U.S. 491.[13] In that case, the United States Senate Subcommittee on Internal Security issued a subpoena duces tecum to a bank where the United States Servicemen's Fund (servicemen fund), a nonprofit membership corporation with a declared purpose of furthering the welfare of United States military personnel, had an account. Id., 493. The servicemen fund, and two of its members, brought an action to enjoin implementation of the subpoena, claiming that it exceeded the legislative power of inquiry and, insofar as the records sought contained the servicemen fund's membership list and its sources of contributions related to a controversial cause, the subpoena violated the first amendment to the constitution of the United States. Id., 494–96.

The United States Supreme Court concluded that, because the subpoena at issue fell within the sphere of legitimate legislative activity, as an investigative tool designed to elicit information related to a matter of congressional concern, the speech or debate clause required the dismissal of the complaint of the servicemen fund. Id., 505–507. In determining that the subpoena was a legitimate legislative activity, the court expressed that the "power to investigate and to do so through compulsory process plainly falls within [the] definition" of legitimate legislative activity because the "[i]ssuance of subpoenas such as the one in question here has long been held to be a legitimate use by Congress of its power to investigate." Id., 504. Responding to the servicemen fund's claim that the subpoena would result in a violation of the first amendment, the court

---

[13] The defendant also relies on the decision of the Superior Court in *Ellef* v. *Select Committee of Inquiry*, Superior Court, judicial district of Hartford, Docket Nos. 04-0832432, 04-0832411, 04-0832524 (April 8, 2004) (36 Conn. L. Rptr. 841). That case involved a challenge to subpoenas issued to private parties, and did not involve the separation of powers doctrine. Thus, neither its factual context nor its reasoning informs our resolution of the present case.

recognized that, in other contexts, first amendment rights had been balanced against public interests but, in the context of the speech or debate clause, "[w]here we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, balancing plays no part. The speech or debate protection provides an absolute immunity from judicial interference. Collateral harm which may occur in the course of a legitimate legislative inquiry does not allow us to force the inquiry to grind to a halt." (Internal quotation marks omitted.) Id., 509–10 n.16. Put another way, because the legislative subpoena was legitimate, the broad nature of the immunity conferred by the speech or debate clause rendered inconsequential the collateral constitutional concerns. Id., 510–11.

*Eastland* is inapposite to the present case. Of course, *Eastland* and the present case share a similarity in that both involve the legislative issuance of a subpoena for investigative purposes; the claims raised, however, are poles apart. In *Eastland*, the gravamen of the servicemen fund's claim was not that the legislative subpoena was an illegitimate exercise of the congressional investigatory power, but rather that the subpoena was improper because of its adverse collateral consequences on the constitutional rights of the servicemen fund's members. Id., 503–504. In the present case, the plaintiff's claim is not that the subpoena should be quashed because its collateral constitutional consequences render it improper; rather, the plaintiff claims that the subpoena should be quashed because the legislative authority to investigate in aid of the impeachment power does not extend to the compulsion of testimony from the sitting chief executive and the subpoena, therefore, is outside the sphere of legitimate legislative activity. Furthermore, *Eastland* is distinguishable because it involved a claim raised by a private party, not, as

here, a challenge to legislative conduct brought by a coequal branch of government. Indeed, we are unaware of any speech or debate case in which the clause was held to insulate a legislative impeachment subpoena that had been challenged on the basis of the separation of powers.

Because the speech or debate clause confers immunity from suit, at this stage we must, without considering the merits of the claim, view the plaintiff's challenge through the lens of whether, if successful, it would pierce the immunity conferred by that clause. Given that the plaintiff's claim raises a colorable claim that the conduct of the defendant was not within the sphere of legitimate legislative activity, we conclude that the speech or debate clause does not categorically bar the plaintiff's action, nor does that clause preclude our consideration of the plaintiff's claims on the merits.

3

Ripeness and the Political Question Doctrine

We address the defendant's final two claims concerning subject matter jurisdiction together because they both raise issues of justiciability that are related analytically. The defendant contends that the plaintiff's challenge to the defendant's issuance of the subpoena is nonjusticiable because the claim: (1) is not yet ripe for adjudication and, therefore, does not present the actual and existing controversy necessary for judicial resolution; and (2) presents a political question that this court is precluded from reviewing. We reject both claims.

We first set forth the fundamental principles that underlie justiciability. "Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable." *State* v. *Nardini*, 187 Conn. 109, 111, 445 A.2d 304 (1982). "Justiciability requires (1) that

there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 481, 803 A.2d 318 (2002). As we have recognized, justiciability comprises several related doctrines, namely, standing, ripeness, mootness[14] and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter. *Esposito* v. *Specyalski*, 268 Conn. 336, 346–48, 844 A.2d 211 (2004). Finally, because an issue regarding justiciability raises a question of law, our appellate review is plenary. Id., 348.

a

Ripeness

The defendant contends that the plaintiff's challenge to the defendant's issuance of the subpoena is premature unless and until the governor resists the subpoena and the defendant thereafter either sanctions him or otherwise attempts to force compliance, pursuant to General Statutes §§ 2-1c,[15] 2-46 (a)[16] and 2-48.[17] We dis-

---

[14] We already have decided, in part I A of this opinion, that the case is not moot.

[15] General Statutes § 2-1c provides: "Either house of the General Assembly may determine by majority vote that a person is guilty of contempt of the General Assembly, after a hearing before an appropriate committee appointed by the presiding officer at which the person shall be entitled to give evidence and be represented by counsel. Said house may refer such matter to the Chief State's Attorney. Contempt of the General Assembly shall be punishable by a fine of not more than one hundred dollars or imprisonment for not more than six months or both."

[16] See footnote 8 of this opinion for the text of § 2-46 (a).

[17] General Statutes § 2-48 provides: "Whenever a witness summoned fails to testify and the fact is reported to either house, the president of the Senate or the speaker of the House, as the case may be, shall certify to the fact

agree, and conclude that judicial review of the plaintiff's challenge to the subpoena is appropriate at this time.

We have stated that the rationale behind the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . [and we therefore] must be satisfied that the case before [us] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire." (Citation omitted; internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, 263 Conn. 616, 626, 822 A.2d 196 (2003). In this regard, we are mindful of the general rule that, in order for appellate jurisdiction to be appropriate, a party challenging the validity of a subpoena or discovery order ordinarily must have been found in contempt of the subpoena.[18] See *Green Rock Ridge, Inc.* v. *Kobernat*, 250 Conn. 488, 498, 736 A.2d 851 (1999) (recognizing principle that finding of contempt is jurisdictional prerequisite for appellate review of both discovery orders

under the seal of the state to the state's attorney for the judicial district of Hartford, who shall prosecute therefor."

[18] We note our agreement with the plaintiff that, under the peculiar circumstances of the present case, it would be unseemly and inappropriate to require that the governor resist the subpoena, thereby risking a finding of contempt, merely in order to trigger the procedural mechanism to vindicate the plaintiff's constitutional claim on appeal. By the same token, it would be undesirable to place the defendant in the awkward position of having to commence contempt proceedings against the head of a coordinate branch of government. See *United States* v. *Nixon*, 418 U.S. 683, 691–92, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (concluding that trial court's denial of president's motion to quash subpoena constituted final judgment for purpose of appellate review, despite president not having been found in contempt of subpoena and traditional rule that finding of contempt was prerequisite for appellate jurisdiction, because to require president to disobey court order to trigger procedural mechanism for review would be unseemly and to force federal judge to find president in contempt would be inappropriate). Further, to require a finding of contempt against the governor would itself raise serious separation of powers questions, namely, whether the legislature has the authority to request that a court hold a sitting governor in contempt.

and orders imposing sanctions for failure to comply with discovery); see also *Barbato* v. *J. & M. Corp.*, 194 Conn. 245, 249, 478 A.2d 1020 (1984) (same).

In the present case, however, the defendant represented, during oral argument in this court, that it had no intention of enforcing compliance with its subpoena pursuant to any of its statutorily available remedies. Nevertheless, the defendant has left open the possibility that the governor's failure to comply with a valid subpoena may result in an article of impeachment, standing either on its own or in combination with other allegations of misconduct. In addition, in its brief to this court, the defendant has indicated that the governor's refusal to comply with the defendant's subpoena would entitle the defendant to draw an adverse inference against him, which could affect the defendant's recommendations as to whether articles of impeachment are warranted.

Thus, as a functional matter, the plaintiff's current challenge is the only occasion on which the plaintiff could obtain meaningful review of the constitutional validity of the defendant's issuance[19] of a subpoena. To require the plaintiff to wait until the defendant imposed a sanction by means of an article of impeachment would render the plaintiff's challenge a nonjusticiable political question. We discuss the political question doctrine more fully in the part I B 3 b of this opinion. For present purposes, it suffices to say our state constitution's grant of the impeachment authority to the legislature confers upon it sole jurisdiction with regard to the substantive content of the articles of impeachment.[20] Consequently,

---

[19] Contrary to the implicit suggestion of the Chief Justice in his dissent, we are not deciding whether the failure to comply can be the basis of an article of impeachment. That would indeed be a nonjusticiable, political question. We are only deciding whether the governor is categorically immune from compliance with the subpoena.

[20] In this connection, we reject the suggestion in the Chief Justice's dissenting opinion that it is not clear "why . . . a question that . . . would be nonjusticiable if raised *after* impeachment proceedings have commenced is justiciable if raised *beforehand*." (Emphasis in original.) It is the threat

to deny the plaintiff review of its constitutional challenge at this point "would render impossible any review whatsoever of [its] claims . . . ." *United States* v. *Ryan*, 402 U.S. 530, 533, 91 S. Ct. 1580, 29 L. Ed. 2d 85 (1971). To countenance such a result would be to transform the ripeness doctrine from a principle that counsels against *premature* judicial involvement in a particular controversy into a principle that *forecloses, for all time,* any judicial involvement in the dispute. We therefore reject the defendant's claim as fundamentally incompatible with the underpinnings of the ripeness doctrine itself.

### b

### Political Question

We next turn to the defendant's claim that the plaintiff's constitutional challenge to the defendant's issuance of the subpoena presents a nonjusticiable political question. The political question doctrine itself is based on the principle of separation of powers; *Board of Education* v. *Naugatuck*, 257 Conn. 409, 424, 778 A.2d 862 (2001); as well as the notion that the judiciary should not involve itself in matters that have been committed to the executive and legislative branches of government. "To conclude that an issue is within the political question doctrine is not an abdication of judicial responsibility; rather, it is a recognition that the tools with which a court can work, the data which it can fairly

---

of impeachment for failure to comply with the subpoena that rescues the plaintiff's claims from being moot, because of the collateral consequences doctrine. Simply because the court would not be justified in substantively reviewing an article of impeachment based on such a failure to comply does not mean, as the Chief Justice suggests, that we also must deprive both the plaintiff and, indirectly, the people who elected the governor, from mounting a colorable constitutional challenge that is rendered viable because of the threat of such an article. The Chief Justice's analysis would effectuate such a deprivation. The balance we have struck gives due consideration to both the political process and the colorable constitutional claims of the plaintiff.

appraise, the conclusions which it can reach as a basis for entering judgments, have limits." (Internal quotation marks omitted.) *Pellegrino* v. *O'Neill*, 193 Conn. 670, 687, 480 A.2d 476 (*Healey, J.*, concurring), cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984). "Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case inquiry." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 482.

In considering whether a particular subject matter presents a nonjusticiable political question, we have articulated a number of relevant factors, including: "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. . . . Furthermore, simply because the case has a connection to the political sphere [is not] an independent basis for characterizing an issue as a political question . . . ." (Citations omitted; internal quotation marks omitted.) Id., 482–83. We cannot conclude that any of these factors regarding nonjusticiable political questions is inex-

tricably linked to the present case, thereby precluding its review.

With regard to the first factor, we recognize that "[d]eciding whether a matter has in any measure been committed by the [c]onstitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this [c]ourt as ultimate interpreter of the [c]onstitution." *Baker* v. *Carr*, 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Although the text of our state constitution confers impeachment authority on the legislature; Conn. Const., art. IX, §§ 1 through 4; as we recognized in *Kinsella* v. *Jaekle*, supra, 192 Conn. 723, that authority is not unbounded and legislative encroachment upon other constitutional principles may, in an appropriate case, be subject to judicial review. See *id.*, 727 ("[t]he exclusive power of impeachment, however, does not carry with it the authority to ignore individual rights with impunity"). Accordingly, there has been no constitutional commitment of the impeachment authority to the legislature such that judicial review of the plaintiff's challenge is rendered inappropriate.

Second, there are discoverable and manageable judicial standards for determining the merits of the plaintiff's claim. The thrust of the plaintiff's claim is that the defendant, consistent with the principle of separation of powers, may not compel the testimony of the sitting chief executive on issues related to the performance of his official duties. There are no special impediments to our ascertainment and application of the standards by which to resolve this challenge; indeed, the matter raises questions of constitutional interpretation that, for more than two centuries, regularly have been reserved for the judiciary. See *Wilson* v. *Security Ins. Group*, 199 Conn. 618, 628, 509 A.2d 467 (1986) (" 'It

is emphatically the province and duty of the judicial department to say what the law is.' *Marbury* v. *Madison*, 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 [1803].").

Third, in deciding the merits of the plaintiff's constitutional claim, we would not be reviewing a policy determination of a clearly nonjudicial, discretionary nature. It is true that underlying this matter was a discretionary decision by the defendant to issue the subpoena to the governor. Our consideration of whether that decision comports with constitutional principles, however, does not require us to evaluate the wisdom of that decision, but only whether that decision exceeded constitutional limitations.[21] Cf. *Sheff* v. *O'Neill*, 238 Conn. 1, 13, 678 A.2d 1267 (1996) ("[I]t is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles. *Marbury* v. *Madison*, [supra, 5 U.S. 177] . . . ." [Citations omitted.]).

Fourth, consideration of the merits of the plaintiff's claim would not convey a lack of due respect to a coequal branch of government. "Our system of government requires that . . . courts on occasion interpret the [c]onstitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Powell* v. *McCormack*, supra, 395 U.S. 549. Rather, adjudicating a claim of violation of separation of powers is the ultimate expression of respect for equality among the branches of government.

---

[21] Indeed, as we mentioned in the discussion in part I B 3 a of this opinion regarding ripeness, if the governor were required to wait until an article of impeachment was issued against him, and the governor challenged that issuance in court, then the court would be required to evaluate a discretionary function of the House, namely, the substantive grounds on which the article of impeachment was based. Such a scenario undoubtedly would pose issues of nonjusticiability.

Fifth, this matter does not present an unusual need for unquestioning adherence to a preexisting political decision. As previously discussed, it is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself in excess of the authority conferred upon it by the constitution.

Sixth, and finally, there is no potential embarrassment resulting from multifarious pronouncements by various governmental departments on one question. Indeed, competing positions regarding whether the defendant has the authority to issue a subpoena to the governor already have been made public, with coordinate branches of government advancing diametrically opposed opinions. Our resolution of this issue simply will operate to dispel the confusion that already has been created by these competing pronouncements.[22]

We therefore reject the defendant's contention, endorsed by the dissenting Justices, that the legitimacy of the defendant's subpoena must be left wholly to the two competing political branches of government and the vagaries of the political process, thereby entirely escaping review by this coordinate branch of government. Accordingly, we conclude that the trial court had

---

[22] Justice Zarella, in his dissenting opinion, concludes that judicial consideration of the plaintiff's claims is barred by the political question doctrine. Suffice it to say, however, that our disagreement with Justice Zarella is based on the fact that the primarily *federal* authorities upon which he relies do not take into account the holding in *Kinsella* v. *Jaekle*, supra, 192 Conn. 721, recognizing the nature of impeachment as political, but permitting, under our *state* constitution, judicial intervention in limited circumstances. Furthermore, those federal authorities do not contemplate the unique situation presented by our state constitution, namely, that the governor shall cease to perform his duties once the articles of impeachment are presented by the House. Thus, in contrast to those federal authorities, the complete bar that would be effected by the political question doctrine would be inconsistent with our state constitutional scheme governing the impeachment process, which strikes a balance between the need for judicial review and respect for the political process.

subject matter jurisdiction in the first instance, and that we possess subject matter jurisdiction on appeal. We now turn to the plaintiff's claims on the merits.

## II

### A

### Categorical Immunity

The plaintiff's first claim on the merits is that, by virtue of article second of our state constitution, as amended by article eighteen of the amendments; see footnote 4 of this opinion; which embodies the principle of the separation of powers, the governor is categorically immune from the obligation to testify, pursuant to the subpoena in the present case, before a legislative committee on matters concerning the performance of his official duties. More specifically, the plaintiff claims that: (1) historically speaking, there is a constitutionally based consensus that separation of powers principles bar a chief executive from such an obligation because a legislative subpoena for such testimony has never been heeded or enforced; (2) the constitutional prohibition against obligating the chief executive to testify before the legislature on matters relating to his official duties is particularly compelling in the context of impeachment proceedings; and (3) analogous federal court decisions confirm that a chief executive may not be obligated to testify on such matters.

It is useful to begin by stating what the plaintiff does not claim. It does not claim that the doctrine of executive privilege, which *in general* shields the chief governmental executive and certain other high executive officials from being obligated to testify regarding certain subjects, creates a categorical immunity. Nor does the plaintiff claim that the governor is immune from being subpoenaed by the defendant by virtue of any other recognized testimonial privilege. Thus, the plain-

tiff's claim is based, not on notions of privilege, but on broad and categorical notions of immunity derived, in the plaintiff's view, from the separation of powers doctrine.

We conclude, contrary to the plaintiff's claim, that the separation of powers provision of our state constitution does not provide the governor with categorical immunity from being subpoenaed to testify before the defendant engaged in its investigative, fact-finding and advisory duties regarding possible impeachment of the governor. We base this conclusion on the nature of the defendant's task, on the text of our constitution regarding an impeachment of a governor, on analogous federal case law, on the historical record regarding legislative powers in impeachment proceedings at the federal level, and on constitutional policy.

Under its authorizing resolution, the defendant had the serious and important task of investigating misconduct of the governor, submitting to the House its findings of fact and recommendations, and, if it recommended impeachment, specifying the conduct of the governor underlying such a recommendation. The gravity of this task counsels strongly in favor of the defendant's ability to subpoena the governor, because it was the governor's conduct and intentions that the defendant was charged with investigating; the governor was, therefore, a unique source of such information.

Furthermore, unlike the federal constitution, under which a president continues to exercise his full executive powers until and unless he is convicted by the Senate, under article fourth, § 18 (b), of the state constitution, as amended by article twenty-two of the amendments, "[i]n case of the impeachment of the governor . . . the lieutenant-governor shall exercise the powers and authority and perform the duties appertaining to the office of governor until . . . the governor . . . is

acquitted . . . ." See part I B 1 of this opinion. This provision underscores the great importance of the impeachment process under our constitution, of which the defendant's duties are an integral part, because, following the defendant's investigation and recommendation, the ensuing impeachment of a governor immediately transfers executive power to the lieutenant governor pending the trial in the Senate. There is, therefore, a compelling need for the defendant to have a full and accurate basis for its findings and recommendations because a recommendation of impeachment, if made, results in serious, immediate consequences. This further counsels in favor of permitting the defendant to obligate the governor's testimony, which enables the defendant to gather as much evidence as is reasonably possible. To paraphrase the United States District Court for the District of Columbia: "It would be difficult to conceive of a more compelling need than that of this [state] for an unswervingly fair inquiry based on all the pertinent information." *In re Report & Recommendation of June 5, 1972 Grand Jury*, 370 F. Sup. 1219, 1230 (D.D.C. 1974).[23]

In addition, the defendant's ability to obtain evidence from the governor precisely because it is conducting an investigation into his conduct is *in furtherance* of the critical constitutional check, expressed in the separation of powers provision, on executive authority necessary to preserve the constitution's careful balance of powers, *not* in derogation of it. As this court recognized in *Kinsella* v. *Jaekle*, supra, 192 Conn. 718, the very purpose of impeachment is to curb abuses of power by elected officials by granting the legislature the power

[23] We disagree with the suggestion in the dissenting opinion of Justice Zarella that the political pressure to testify would be sufficient to elicit the requisite testimony from a governor, without the need for a subpoena or judicial intervention validating the subpoena. Although that may or may not be true in some instances, it clearly was not in the present case, as the historical record indicates. See footnote 1 of this opinion.

to remove them. See A. Hamilton, Federalist No. 66 (Rev. Ed. 1901) pp. 429–30 (impeachment power is fully consistent with separation of powers because it acts as "an essential check in the hands of [the legislative] body upon the encroachments of the executive"); J. Labovitz, Presidential Impeachment (1978) p. 2 ("[t]o avoid executive usurpation of power, the delegates sought to provide checks upon his conduct, including provisions for his removal through impeachment"). "By its nature the power to impeach is at once both investigatory and accusatory. It imports the inherent authority to conduct, within constitutional limitations, such investigations and hearings as may be necessary to resolve any question of impeachable conduct." *Kinsella* v. *Jaekle*, supra, 725. The issuance of a subpoena by the defendant to compel witnesses to testify on matters relevant to this investigation is an indispensable component of the defendant's impeachment authority. See *Kilbourn* v. *Thompson*, supra, 103 U.S. 190 (where question of impeachment is before controlling authority, "we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases"); see also R. Berger, Impeachment: The Constitutional Problems (1973) pp. 141, 149 (impeachment power is "exception" to separation of powers principle); J. Turley, "Congress As Grand Jury: The Role of the House of Representatives in the Impeachment of an American President," 67 Geo. Wash. L. Rev. 735, 738 (1999) ("the impeachment provisions are understood best as part of the separation of powers—as a check on executive power"). It would be constitutionally peculiar if the legislature, engaged in the impeachment process in order to vindicate the separation of powers provision, were categorically barred by that very provision from securing the testimony of the person who, not only is

the target of the impeachment process, but who undoubtedly is the best source of information regarding the alleged conduct that gave rise to the impeachment process.[24]

Although there is no case precisely on point in which a legislative impeachment committee, like the defendant in the present case, has sought to secure the testimony of a governor by way of a subpoena, the United States Supreme Court uniformly has rejected a sitting president's claim to categorical immunity, on the basis of the separation of powers, in similar contexts. In *United States* v. *Nixon*, 418 U.S. 683, 706, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974), the court rejected President Richard M. Nixon's claim that the separation of powers categorically barred a subpoena duces tecum issued by the special prosecutor for production of the famous "Watergate tapes." The court stated that "the doctrine of the separation of powers . . . without more, [cannot] sustain an absolute, unqualified [p]residential privilege of immunity from judicial process under all circumstances." Id. The court's rejection of a sweeping claim of executive privilege because it would place a serious impediment on a coordinate branch of government was reaffirmed in *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 441, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977), wherein the court held that the Presidential Recordings and Materials Preservation Act's reg-

[24] We disagree, therefore, with Justice Zarella's contention in his dissenting opinion, which is based entirely on nonimpeachment authorities, that, because courts traditionally have balanced "the legislature's need for the information against the intrusion on the executive branch that compliance with the subpoena will occasion," the court therefore would become entangled with the impeachment process without discoverable judicial standards. As we explain in this opinion, the basis for the legislature's need for the governor's testimony is clear, the legislative authority in the impeachment process is at its height, while the plaintiff's claims of immunity are at their nadir, and the judiciary, by declining to engage in such a balancing process, is in no way becoming so entangled.

ulation of the disposition of presidential materials within the executive branch did not constitute, without more, a violation of the principle of separation of powers. Most recently, in *Clinton* v. *Jones*, 520 U.S. 681, 684, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997), the Supreme Court rejected President William J. Clinton's generalized separation of powers challenge to a federal court's authority to adjudicate a private civil action against a sitting president. In so doing, the court reiterated that the doctrine of separation of powers does not by itself confer an absolute, unqualified presidential privilege of immunity from suit by a private party, and that the significant burden on the president's time and attention in responding to a lawsuit while still president was insufficient as a matter of law to constitute a violation of the separation of powers doctrine. Id., 691–706. Indeed, in the historic trial of former Vice President Aaron Burr for treason, Chief Justice John Marshall, in ruling that President Thomas Jefferson could be compelled to comply with a subpoena duces tecum, assumed "that the president of the United States may be subpoenaed, and examined as a witness . . . ." *United States* v. *Burr*, 25 F. Cas. 187, 191 (C.C.D. Va. 1807); see also *United States* v. *Burr*, 25 F. Cas. 30, 34–35 (C.C.D. Va. 1807). In terms of the separation of powers, we see no persuasive reason why these holdings rejecting categorical immunity of the chief executive from judicial process should not apply to a similar claim of categorical immunity from legislative process issued in the course of the legislature's exercise of its core constitutional power to impeach.

The weight of the historical record also supports the ability of the defendant to issue this subpoena to the governor. Various statements of United States presidents, from President George Washington through President Ulysses S. Grant have, in general terms, affirmed the right of the legislature, acting pursuant to its

impeachment powers, to obtain evidence from the executive for that purpose. The most direct statements on the subject were made in 1846 by President James K. Polk: "If the House of Representatives, as the grand inquest of the nation, should at any time have reason to believe that there has been malversation in office by an improper use or application of the public money by a public officer, and should think proper to institute an inquiry into the matter, all the archives and papers of the [e]xecutive [d]epartments, public or private, would be subject to the inspection and control of a committee of their body and every facility in the power of the [e]xecutive be afforded to enable them to prosecute the investigation." 4 J. Richardson, A Compilation of the Messages and Papers of the Presidents (1897) p. 435. President Polk further stated that the impeachment power gave the House of Representatives "the right to investigate the conduct of all public officers under the [g]overnment. This is cheerfully admitted. In such a case the safety of the [r]epublic would be the supreme law, and the power of the House in the pursuit of this object would penetrate into the most secret recesses of the [e]xecutive [d]epartment. *It would command the attendance of any and every agent of the [g]overnment, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to all the facts within their knowledge.*"[25] (Emphasis added.) Id., p. 434.

Similarly, President Washington, in rejecting the House's request for papers concerning the negotiation of the Jay Treaty, specifically noted that the House's right to the documents would have been different if

---

[25] President Polk, obviously recognizing the delicate nature of certain executive information, also remarked that the House would be obliged to "adopt all wise precautions to prevent the exposure of all such matters the publication of which might injuriously affect the public interest, except so far as this might be necessary to accomplish great ends of public interest." 4 J. Richardson, supra, pp. 434–35.

they had been sought for the purpose of impeachment. J. Labovitz, supra, p. 211, citing 4 Annals of Cong., 1st Sess., pp. 760–62 (1796). President John Quincy Adams stated "that it would be a 'mockery . . . to say that the House should have the power of impeachment extending even to the president . . . and yet to say that the House had not the power to obtain the evidence and proofs on which impeachment was based.' " M. Gerhardt, The Federal Impeachment Process: A Constitutional and Historical Analysis (2d Ed. 2000) p. 114, quoting Cong. Globe, 27th Cong., 2d Sess., p. 580 (1842). Both President Andrew Jackson and President Grant echoed these acknowledgments. See 13 Reg. Deb. 202 (1837) (Jackson); 7 J. Richardson, supra, p. 362 (Grant) ("[w]hat the House of Representatives may require as of right in its demand upon the [e]xecutive for information is limited to what is necessary for the proper discharge of its powers of legislation *or of impeachment*" [emphasis added]).

In addition to these comments expressed on behalf of the executive branch, the legislative branch has deep historical roots in its records regarding its power to gather all of the necessary evidence in order to make an informed and appropriate evaluation in the exercise of the impeachment process. It was discussed as early as 1796, when it was stated on the floor of the House that "the power of impeachment 'certainly implie[s] a right to inspect every paper and transaction in any department, otherwise [it] could never be exercised with any effect.' " J. Labovitz, supra, p. 211, citing 4 Annals of Cong., supra, p. 601. This sentiment was echoed in 1843 when a House committee, which was engaged in a dispute with President John Tyler about the production of documents that ultimately were produced, similarly explained: "The House of Representatives has the sole power of impeachment. The President himself, in the discharge of his most independent func-

tions, is subject to the exercise of this power—a power which implie[s] the right of inquiry on the part of the House to the fullest and most unlimited extent . . . . If the House possesses the power to impeach, it must likewise possess all the incidents of that power—the power to compel the attendance of all witnesses and the production of all such papers as may be considered necessary to prove the charges on which the impeachment is founded. If it did not, the power of impeachment conferred upon it by the Constitution would be nugatory. It could not exercise it with effect." (Internal quotation marks omitted.) J. Labovitz, supra, p. 211, quoting 27th Cong., 3d Sess., H.R. Rep. No. 271, pp. 4–6. More recently, the House Judiciary Committee that recommended the impeachment of President Nixon remarked: "Whatever the limits of the legislative power in other contexts—and whatever need may otherwise exist for preserving the confidentiality of Presidential conversation—in the context of an impeachment proceeding the balance was struck in favor of the power of inquiry when the impeachment provision was written into the Constitution." House Judiciary Committee, Impeachment of Richard M. Nixon, President of the United States, H.R. Rep. No. 93-1305, p. 209 (1974).

As we have suggested, serious policy concerns also support the validity of the subpoena in the present case. The compelling governmental need for all of the relevant information, not just from third parties but from the governor whose conduct and intentions are under scrutiny, so that a decision by the defendant is based on as much information as it can reasonably gather, supports the right of the defendant to compel the testimony of the governor. The categorical immunity proposed by the plaintiff would place a serious impediment on the legislative branch's ability to discharge effectively its own core constitutional duty to exercise

the impeachment power with which it has been entrusted.

We recognize that the impeachment power is a strong legislative weapon and that, if left unchecked, the legislature could abuse its authority. The existence, however, of constitutional safeguards—a division of impeachment power between the House and the Senate, and the two-thirds supermajority vote requirement for conviction in the Senate—provide sufficient protection against such abuse. *Nixon* v. *United States*, 506 U.S. 224, 236, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993). Our state constitution provides the same structural protection. Conn. Const., art. IX, § 2; see *Kinsella* v. *Jaekle*, supra, 192 Conn. 720. In addition, under our law, as we have explained, there is some recourse to the courts for judicial protection from constitutional abuse by the legislature.

In sum, it would be constitutionally perverse to conclude that it would be a violation of the separation of powers doctrine for the legislature to discharge its constitutional responsibilities. Our state's impeachment process is reserved for the legislature to demand an accounting from the governor regarding alleged abuses of his power. The rejection by the framers of our constitution of the British practice of insulating the king from impeachment was to ensure that the chief executive would not be above the law. See *Kinsella* v. *Jaekle*, supra, 192 Conn. 718–19. Allowing the chief executive officer to withhold information from the defendant on the basis of the separation of powers doctrine undercuts that goal by hindering the only constitutionally authorized process by which the legislature may hold him accountable for his alleged misconduct. See M. Gerhardt, supra, p. 115.

The plaintiff contends, nonetheless, that, on the basis of federal history, there is a constitutionally based con-

sensus that the separation of powers doctrine bars a chief executive from being obligated to testify, because such testimony never has been heeded or enforced. We are not persuaded.

It is true that our constitutional separation of powers provision shares the history and purposes of its federal constitutional counterpart. "For reasons indigenous to the history and development of this state, and this country, and for the same, self-evident purposes for which the concept of separation of powers was originally implemented, the Connecticut constitution, which, less than a decade ago, was redrafted and ratified by the people in the context of three hundred years of self-government, continued the separate magistracies of a popularly elected executive and legislature and an independent judiciary. The constitution defines and circumscribes the powers of these three magistracies of government. As Chief Justice Marshall observed in 1803: 'To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?' *Marbury* v. *Madison*, [supra, 5 U.S. 176]." *Szarwak* v. *Warden*, 167 Conn. 10, 45–46, 355 A.2d 49 (1974).

We also acknowledge, as the plaintiff suggests, that "[d]eeply embedded traditional ways of conducting government cannot supplant the [c]onstitution or legislation, but they [may] give meaning to the words of a text or supply them." *Youngstown* v. *Sawyer*, 343 U.S. 579, 610, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) (Frankfurter, J., concurring). Thus, the plaintiff maintains, a federal history of Congressional "acquiescence to assertions of executive privilege [in response to Congressional demands for information regarding the performance by the president of his official duties] strongly suggests that separation of powers principles encompass the

chief executive's right to refuse to testify before a legislative committee."

The plaintiff's historical support for this proposition consists entirely, however, of various internal letters and memoranda from the office of the United States Attorney General, and certain presidential refusals, in the nineteenth and twentieth centuries, to comply with Congressional resolutions and inquiries demanding information regarding the performance of presidential duties.[26] None of those instances, however, involved the exercise of the impeachment power. Suffice it to say that, contrary to the contention of the plaintiff, it cannot be said that there is such a deeply embedded history of executive noncompliance with legislative subpoenas regarding the conduct of the chief executive, federal or state, *in the impeachment process*, that it gives meaning to the separation of powers in such a way as to bar the subpoena in the present case. Indeed, as we have

---

[26] For instance, the plaintiff refers to a 1999 letter from former Attorney General Janet Reno to President Clinton, and a 1971 letter from then Assistant Attorney General William H. Rehnquist to certain White House staff stating, for all intents and purposes, that the president and his immediate advisors are immune from testimonial compulsion. The plaintiff also refers to refusals by President Jackson, President James Buchanan, and President Grant to provide certain information in response to legislative requests. Finally, the plaintiff points out that, in 1953, the House Committee on Un-American Activities commanded President Harry S. Truman to testify before it. President Truman refused to comply and stated, in a subsequent radio address, "[a] Congressional committee may not compel the attendance of the President of the United States, while he is in office, to inquire into matters pertaining to the performance of his official duties."

In a different vein, the plaintiff also argues that on the rare occasions that presidents have testified before Congress, they have done so voluntarily, and that the legislature, even in situations in which presidential testimony would have been useful, often has declined to seek the testimony of certain presidents. We fail to see, however, how the voluntary testimony of any executive, or any legislative declinations on the subject, shed any light on this issue. The question is not whether chief executives have testified in the past, or whether the legislature has been persistent in seeking that testimony, but whether the legislature, in the context of its constitutional power of impeachment, *may obligate* the chief executive to testify.

indicated, to the extent that historical sources have focused on the impeachment process, that history is to the contrary.

We now turn to the plaintiff's second argument, namely, that the constitutional prohibition against obligating the chief executive to testify before the legislature on matters relating to his official duties is particularly compelling in the context of impeachment proceedings. In this regard, the plaintiff contends that the importance of interpreting the separation of powers principles so as to bar a testimonial subpoena to the chief executive "is heightened in the context of an impeachment investigation. . . . [B]ecause the separation of powers machinery is placed under great strain in such circumstances, the delicate balance between the legislative and executive branch is uniquely vulnerable to severe and irreparable harm . . . [and carries a] potential for distraction and intimidation [that] not only threatens the health of the executive branch, but also offers opportunities for abuse by the legislature of its extraordinary control over the chief executive's priorities and powers." (Citations omitted.) Thus, the plaintiff claims, impeachment is so threatening to the executive that the separation of powers doctrine requires the erection of "high[er] walls" between the legislative and executive branches than would ordinarily be the case. In this connection, the plaintiff relies on the history that, in the impeachment proceedings against both President Nixon and President Clinton, Congress did not issue a subpoena for their testimony, and that in the three gubernatorial impeachment proceedings in this century, no such subpoenas were issued.[27] The plaintiff also emphasizes that the defendant's function is simply investigative, as opposed to the function of the House of Representatives to which

[27] These three proceedings took place in Oklahoma in 1994, in Arizona in 1988, and in Alaska in 1985.

it must report, which actually decides whether to impeach. We reject these contentions.

To the contrary, we think that, precisely because the present case *is* related to the impeachment process, the legislature is acting at the height of its powers and the plaintiff's claim to categorical immunity is at its nadir. Thus, we believe that alleged misconduct of a chief executive that is sufficient to warrant an impeachment inquiry should not, as the plaintiff's contention suggests, present a reason for exempting him from accountability; rather, it should have the opposite effect. "[T]he impeachment power necessarily implies a congressional power to inquire about presidential wrongdoing, as well as a corresponding obligation on the part of the president to respond to such inquiries." F. Bowman III & S. Sepinuck, " 'High Crimes & Misdemeanors': Defining the Constitutional Limits on Presidential Impeachment," 72 S. Cal. L. Rev. 1517, 1539 (1999); see M. Gerhardt, "The Constitutional Limits to Impeachment and its Alternatives," 68 Tex. L. Rev. 1, 93 (1989) ("the [p]resident is not above the . . . law, there is no sound reason for exempting him from accountability, especially in the impeachment process"); A. Cox, "Executive Privilege," 122 Penn. L. Rev. 1383, 1435 (1974) ("[h]istory gives no affirmative support to presidential claims of privilege to withhold information from the House of Representatives while it is considering impeachment").

In this regard, there are two significant differences between our state constitution and the federal constitution. The first is that, unlike the federal constitution, which lodges *all* executive power in the president,[28]

[28] Article two, § 1, of the constitution of the United States provides in relevant part: "The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows . . . ."

and, accordingly, mentions only that office, as well as the office of the vice president, who is elected along with the president, our state constitution refers to the executive branch as consisting of, not only the governor and lieutenant governor, who is elected along with the governor, but also the secretary of the state, treasurer, comptroller and attorney general, as well as the division of criminal justice and a council on gubernatorial incapacity. See Conn. Const., art. IV. Although, it is true, that, under article fourth, § 5, of the Connecticut constitution[29] "[t]he supreme executive power of the state shall be vested in the governor," it cannot be said of the governor, as it is appropriately said of the president, that he or she is *the* executive branch of the government.

The second difference from the federal constitution for purposes of the present case is even more significant. As we already have noted, our constitution requires an impeached governor to step down temporarily until the outcome of the impeachment trial in the Senate. Furthermore, as we have also noted, it is the defendant in this case that is charged with the grave responsibility of finding the facts and making recommendations regarding the impeachable misconduct, if any, of the governor. These provisions convince us that the defendant plays, not a subordinate or preliminary role in the impeachment process, as the plaintiff's arguments suggest, but a vitally important role. Furthermore, the defendant's role in that process cannot be separated from that of the House itself, as the plaintiff's argument also suggests. It is, as we have indicated, an integral part of the process by which the House of Representatives decides whether to impeach.

[29] Article fourth, § 5, of the constitution of Connecticut provides: "The supreme executive power of the state shall be vested in the governor. No person who is not an elector of the state, and who has not arrived at the age of thirty years, shall be eligible."

Moreover, the plaintiff's contention that the subpoena violates the separation of powers because having to testify will take the governor away from his duties as chief executive is sufficiently answered by the Supreme Court's decision in *Clinton* v. *Jones*, supra, 520 U.S. 681. If the separation of powers doctrine does not give the president categorical immunity from suit by a private party while in office, it does not, a fortiori, do so with respect to a legislative subpoena to the governor by a duly authorized impeachment investigative committee. Indeed, the concern expressed in *Clinton* v. *Jones*, supra, 691–92, namely, that the president should not be exposed to undue and prolonged distraction from his official duties by a private lawsuit arising out of his prepresidential conduct, is particularly inapt in the present context. In this respect, there is no evidence in the record that suggests that the defendant would unduly prolong the governor's attendance in compliance with the subpoena, nor can it reasonably be maintained that the procedure would be overly burdensome in a spatial sense—the plaintiff and the defendant are located in the same building. Given our constitutional order, and given that the impeachment process is part and parcel of the separation of powers, designed to check abuses of power, it is part of the governor's official duties to respond to demands for his testimony by a duly authorized legislative impeachment panel.

Finally, we reject the plaintiff's contention that the governor is categorically immune from this subpoena, on the basis of federal court decisions that, in the plaintiff's view, strongly suggest that a chief executive may not be obligated to testify regarding his official duties. See, e.g., *United States* v. *Nixon*, supra, 418 U.S. 713; *Nixon* v. *Fitzgerald*, supra, 457 U.S. 731; *Clinton* v. *Jones*, supra, 520 U.S. 681. These cases do not support the plaintiff's claim. First, the portion of the decision in *United States* v. *Nixon*, supra, 713, on which the

plaintiff relies involved the ability of the president to "invoke a claim of privilege on the return of the subpoena," at which time the court would rule on the claim of privilege, balancing the claim of privilege against the need for the information. The president's assertion of confidentiality in that case is in no way analogous to the claim of categorical immunity from compliance with the subpoena that the plaintiff argues for in the present case. Second, *Nixon* v. *Fitzgerald*, supra, 751, held that the president is absolutely immune from a civil suit *by a private party* for his official duties or conduct at the outer perimeter of those duties, because "diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." The present case does not involve such a lawsuit. Finally, the portion of the decision in *Clinton* v. *Jones*, supra, 691–92, on which the plaintiff relies is the court's statement that it was not deciding whether a court could compel the president to appear at a particular time and place, and that his governmental duties would command appropriate accommodation for such testimony. The court's practical regard for the president's "busy schedule"; id., 692; is quite different from the plaintiff's claim of categorical immunity in the present case. Thus, those cases did not involve a claim of categorical immunity from testimony in an impeachment proceeding, on the basis of the separation of powers. Without belaboring the point, it suffices to say that the cases that we have cited and discussed herein persuade us that federal law provides no support for the proposition of categorical immunity that the plaintiff presents.

B

Other Claims Based Upon the Separation of Powers

The plaintiff's final claim is that, even if the governor is not categorically immune from compelled testimony before a legislative impeachment committee, the sub-

poena issued by the defendant violates the separation of powers doctrine under the particular circumstances of this case because: (1) the subpoena was not issued as an investigative tool of last resort; and (2) the defendant has not provided the governor with adequate notice of the scope of its inquiry, the standard for impeachment or the burden of proof against which it will measure the evidence.[30] We reject these contentions.

We turn first to the plaintiff's claim that the subpoena violates the separation of powers doctrine because the defendant has not demonstrated that the issuance of the subpoena was an absolute necessity. Specifically, the plaintiff claims that, by issuing the subpoena at an early stage of its investigation, the defendant has "demonstrate[d] an utter lack of regard for the deference and respect due a coordinate branch of government." The plaintiff contends that a legislative subpoena of a sitting governor comports with the separation of powers doctrine, if at all, only if it complies with the following four conditions: (1) it is issued as a "last resort"; (2) "the most compelling demonstration ha[s] been made that specific information [is] required"; (3) "such information [is] absolutely indispensable to the legislature's work"; and (4) "all other efforts to obtain [the] information through less disruptive means [have] failed." The plaintiff further contends that the defendant not only has failed to comply with that stringent standard, but rather "has pursued exactly the opposite course: [it] has summoned the [g]overnor to testify

---

[30] We note that the defendant does not cast this claim in terms of a due process violation; compare *Kinsella* v. *Jaekle*, supra, 192 Conn. 728 ("plaintiff claims that article ninth of the Connecticut constitution violates both the fourteenth amendment to the United States constitution and article first, §§ 8, 9, and 10 of the Connecticut constitution by its failure to establish standards for impeachable conduct and by its lack of due process guarantees"); and confirmed in oral argument before this court that its claim is based solely on the separation of powers doctrine.

as its first public witness; it has resorted to that drastic step at what is—according to one of [its] cochairs—'the earliest phases of [its] inquiry'; [and] it has done so in the absence of any public proof of impeachable conduct . . . [or] any showing that the information it seeks is essential to its investigation; and it has not demonstrated that such information is unavailable from any other source."

We reject the plaintiff's primary contention essentially for the reasons that we already have rejected the plaintiff's claim of categorical immunity from compliance with the subpoena issued by the defendant. See part II A of this opinion. As we have explained, the defendant's ability to obtain evidence from the governor is in furtherance of the separation of powers principle, not in derogation of it, because the impeachment authority of the legislature is the ultimate constitutional check on the abuse of executive authority—a check necessary to preserve the delicate balance of powers that represents the core principle underlying the separation of powers doctrine. Moreover, the defendant's investigative, fact-finding and recommending responsibilities are unusually important under our constitutional impeachment provisions in view of the fact that, if the House of Representatives accepts an impeachment recommendation by the defendant, the power of the executive is transferred immediately from the governor to the lieutenant governor pending the governor's impeachment trial in the Senate. In light of the defendant's significant role in the impeachment process, its need to obtain as much relevant and reliable evidence as possible is essential if it is to discharge effectively its duties and ultimately make an informed recommendation to the House. Almost always, if not invariably, the governor, whose conduct is the subject of the defendant's inquiry, will be an invaluable source of information; indeed, he may be the only repository of firsthand

information regarding critical aspects of the defendant's investigation.

Given these compelling considerations, we perceive no legitimate reason why the separation of powers provision mandates that the defendant be required to put off any attempt to obtain the governor's testimony until it can demonstrate that it has exhausted all other possible avenues of investigation. On the contrary, the critical role that the defendant plays in our constitutional impeachment scheme militates in the opposite direction.[31]

We next turn to the plaintiff's claim that the subpoena violates the separation of powers provision because the defendant has neither provided the governor with adequate notice of the scope of its inquiry nor articulated the standard for impeachment and the relevant burden of proof against which it will measure the evidence. In this regard, the plaintiff contends that, "[a]s a result of the [defendant's] refusal to provide advance notice of the matters on which he would testify, the [g]overnor, if compelled to appear, would be forced

---

[31] Contrary to the plaintiff's assertion, *United States* v. *Nixon*, supra, 418 U.S. 702, does not support the balancing test that the plaintiff asserts must be performed before a governor may be called to testify before an impeachment panel. The plaintiff claims that, in *Nixon*, the United States Supreme Court "conclud[ed] that the [s]pecial [p]rosecutor seeking production of documents from the [p]resident had 'made a sufficient showing to justify' [the subpoena] in part because '[t]he subpoenaed materials [were] not available from any other source.'" Although it is true that the Supreme Court came to that conclusion in *Nixon*, the plaintiff quotes that passage in isolation and ignores the legal and procedural underpinnings of the [c]ourt's ruling. In affirming the [D]istrict [C]ourt's order requiring President Nixon to comply with the subpoena duces tecum, the Supreme Court concluded that "the [s]pecial [p]rosecutor ha[d] made a sufficient showing to justify a subpoena for production *before* trial." (Emphasis in original.) *United States* v. *Nixon*, supra, 702. Contrary to the plaintiff's assertion, the "showing" referred to by the court was not rooted in separation of powers concerns at all, but, rather, was based on the requirements of rule 17 (c) of the Federal Rules of Criminal Procedure pertaining to requests for pretrial production of documents generally.

essentially to guess about the subject of the [defendant's] questioning" and "would have no choice but to review a decade's worth of potentially relevant information—every credit card receipt, every deposit slip, every contract awarded by the state [and] every piece of correspondence related to such contracts." The plaintiff further contends that "[w]ithout articulation of the standard of conduct and burden of proof, the time and effort of preparing for compelled testimony 'would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch.' "

We also reject these arguments for the same reasons that we have rejected them in the context of the plaintiff's categorical immunity claim. As the United States Supreme Court observed in *Clinton* v. *Jones*, supra, 520 U.S. 702–703: "[The] petitioner errs by presuming that interactions between the [j]udicial [b]ranch and the [e]xecutive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the [e]xecutive's ability to perform its constitutionally mandated functions. . . . As Madison explained, separation of powers does not mean that the branches 'ought to have no partial agency in, or no controul over the acts of each other.' The fact that a federal court's exercise of its traditional [a]rticle III jurisdiction may significantly burden the time and attention of the [c]hief [e]xecutive is not sufficient to establish a violation of the [c]onstitution." (Citations omitted.) Similarly, although there is nothing about the subpoena in the present case that strikes us as particularly burdensome, the fact that the legislature's exercise of its core constitutional power to impeach may impose certain burdens on the time and attention of the governor simply is insufficient to establish a violation of the separation of powers.[32]

---

[32] Of course, if, for example, the defendant were to require the governor to appear before it for a patently unreasonable length of time or to answer questions of an utterly offensive and irrelevant nature, the governor might

Moreover, the specific concerns expressed by the plaintiff are exaggerated. At the time of oral argument before this court in the present case, many, if not most, of the other witnesses called by the defendant in connection with its inquiry already had testified publicly,[33] and the plaintiff had been provided with copies of the documents in the defendant's possession relevant to the testimony of those witnesses. That testimony and materials revealed the scope and nature of the inquiry in considerable detail. Furthermore, we think that the plaintiff's estimate of the time and effort required of the governor to prepare for testimony before the defendant simply is unrealistic. Given what the public record already has disclosed about the scope and nature of the defendant's inquiry at this late stage of the proceedings, we fail to see how the governor's obligation to respond truthfully to questions regarding his conduct would require him to undertake the mammoth task described by the plaintiff.

The judgment is affirmed.

SULLIVAN, C. J., dissenting. I agree with Justice Zarella's mootness analysis, in which he concludes that the *sole* issue before this court is the validity of a legislative subpoena to the governor enforceable only by the threat of impeachment. I also agree that that issue is nonjusticiable and, accordingly, that the complaint of the plaintiff, the office of the governor of Connecticut, should be dismissed. I write separately to emphasize certain points.

The majority states that "if the governor were required to wait until an article of impeachment was

---

have a cognizable separation of powers or due process claim. There is nothing in the record, however, to indicate any likelihood of such an eventuality, and the plaintiff has not suggested otherwise.

[33] As we have noted, certain potential witnesses have invoked their fifth amendment privilege against self-incrimination and, therefore, did not provide testimony. The identity of those witnesses also is a matter of record.

issued against him, and the governor challenged that issuance in court, then the court would be required to evaluate a discretionary function of the House, namely, the substantive grounds on which the article of impeachment was based. Such a scenario undoubtedly would pose issues of nonjusticiability."[1] Thus, the majority recognizes that the grounds for impeachment are committed *solely* to the legislature. Moreover, the majority recognizes that whether the subpoena is enforceable by traditional means is not before it. The majority nevertheless concludes that it has jurisdiction to consider whether the governor is "categorically immune from the legal obligation to testify." I disagree.

The defendant, the select committee of inquiry to recommend whether sufficient grounds exist for the House of Representatives to impeach Governor John G. Rowland pursuant to article ninth of the state constitution, cites several cases for the proposition that the chief executive is not immune from the legal obligation to respond to a legislative subpoena if the information sought outweighs any competing interest in executive independence or confidentiality. See *Clinton* v. *Jones*, 520 U.S. 681, 707–708, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997) (president's deposition testimony required to avoid prejudice to plaintiff that might result from delaying trial of civil claim against president); *United States* v. *Nixon*, 418 U.S. 683, 687, 712–13, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (when special prosecutor sought information from president in connection with ongoing criminal case against seven named individuals, fundamental demands of due process of law in fair administration of criminal justice outweighed president's generalized interest in confidentiality); *Nixon* v. *Sirica*, 487 F.2d 700, 716–17 (D.C. Cir. 1973) (grand

---

[1] In this regard, I do not understand why the majority believes that a question that it concedes would be nonjusticiable if raised *after* impeachment proceedings have commenced is justiciable if raised *beforehand.*

jury's need for information in criminal case outweighed president's interest in confidentiality); *United States* v. *Virgin Islands*, No. 1984-104, 2001 WL 1249674, *2 (D. Virgin Islands, October 17, 2001) (court could order governor to testify on "matter of extreme importance to the public safety and well-being" when governor voluntarily placed himself under power of court by agreeing to terms of consent decree); *United States* v. *Poindexter*, 732 F. Sup. 142, 154–55 (D.D.C. 1990) (criminal defendant could subpoena former president's deposition testimony when required for fair trial); *Halperin* v. *Kissinger*, 401 F. Sup. 272, 275 (D.D.C. 1975) (plaintiff's need for former president's testimony in civil case outweighed president's interest in confidentiality when president was "uniquely capable of clarifying certain . . . issues"); see also *United States* v. *Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) (in criminal case, court must weigh president's claim of confidentiality against defendant's need for information sought); *United States* v. *Burr*, 25 F. Cas. 30, 34–35 (C.C.D. Va. 1807) (granting motion for subpoena to president in criminal case); see also *Thompson* v. *German Valley R. Co.*, 22 N.J. Eq. 111, 114–15 (1871) (governor bound to appear and testify in response to subpoena in civil case but court would not order him to do so or hold him in contempt if he refused; sole remedy was action for damages by party injured by governor's refusal to testify).[2] I am in full accord with the spirit of these cases holding that, under our system of law, not even the highest government official may deny with impunity a demand for information from another branch of government when that information is required to protect

---

[2] In the one case cited by the defendant in which a congressional committee issued a subpoena to the president seeking information relating to wrongdoings by the president, the court dismissed the committee's enforcement action because it had not shown sufficient need for the information. See *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731–33 (D.C. Cir. 1974).

or adjudicate the rights of a third person. That principle does not apply in the present case, however. More fundamentally, in each of these cases, there existed a remedy for the chief executive's refusal to comply with the subpoena. Even if it is assumed that the chief executive could not have been subject to a capias or to contempt proceedings while in office,[3] an issue that none of these cases directly addressed, it is possible that he could have been subject to such proceedings after leaving office. Moreover, it is possible that, if a court determined that the production of information by a chief executive was essential to the fair adjudication of a third person's rights in a civil or criminal proceeding, and the chief executive nevertheless refused to produce the information, the court could dismiss the underlying proceeding, a potential collateral consequence that could also save the issue from being moot. In addition, it is possible that a chief executive who failed to comply with a valid subpoena could be subject to an action for damages. See *Thompson* v. *German Valley R. Co.*,

---

[3] The majority appears to recognize, and I agree, that separation of powers principles very likely would bar such proceedings against a sitting chief executive. See *United States* v. *Nixon*, supra, 418 U.S. 691–92 (requiring court to find president in contempt would be inappropriate). I note that the defendant has not identified a single instance in the history of this nation in which a legislative body has issued a subpoena for testimony to a sitting president or governor, in connection with an impeachment investigation or otherwise, much less an instance in which such a subpoena has been enforced through the issuance of a capias or initiation of contempt proceedings. As the United States Supreme Court has stated in another context, "[t]hat prolonged reticence would be amazing if such interference [with the executive branch] were not understood to be constitutionally proscribed." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 230, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995) (holding that federal statute providing for reopening of court judgments violated separation of powers). Thus, it is arguable that the validity of a legislative subpoena issued to a chief executive is *never* a justiciable question because a judicial remedy is never available. See T. Peterson, "Prosecuting Executive Branch Officials for Contempt of Congress," 66 N.Y.U. L. Rev. 563 (1991) (arguing that president should be immune from contempt proceedings for failure to comply with legislative requests for information).

supra, 115. In other words, in each case, practical relief was available upon a judicial determination that the subpoena was valid.

In contrast, in the present case, the majority's determination that the governor is obligated to testify has no attendant practical consequences.[4] The defendant indicated that it would not issue a capias or institute contempt proceedings against the governor and the legislature could issue an article of impeachment for his failure to testify regardless of this court's opinion as to his legal obligation to do so. As the majority itself recognizes, when the court is precluded from granting practical relief, the case is moot. See *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 125–26, 836 A.2d 414 (2003).

The majority states that, "[s]imply because the court would not be justified in substantively reviewing an article of impeachment based on [the governor's] failure to comply does not mean . . . that we also must deprive both the plaintiff and, indirectly, the people who elected the governor, from mounting a colorable constitutional challenge that is rendered viable because of the threat of such an article." The majority also states repeatedly that the question that it is deciding is whether the governor is "categorically immune from compliance with the subpoena," not whether the governor may be compelled to testify. In my view, however, the plaintiff's constitutional challenge is not "rendered viable" by the existence of a potential practical consequence that this court's opinion cannot affect one way

---

[4] If the majority's decision had any effect on the defendant's decision whether to recommend an article of impeachment, it was a purely political one. A decision that the governor had no obligation to comply would have tended to delegitimize such a recommendation in the eyes of the public and to generate political pressure against it. The decision that the subpoena was valid presumably had the opposite effect. This court is not in the business of issuing advisory decisions for the purpose of influencing public opinion.

or the other. The majority has provided no authority for the proposition that the governor, or the people of this state, are entitled to a purely advisory opinion from this court because the plaintiff raises a matter of great public interest.

The strangeness of the phrase "immune from compliance" further highlights the basic flaw in the majority's analysis. As a general matter, the notion of immunity implies some sort of protection from or invulnerability to the threat of sanctions or enforcement by a third party. Presumably, the governor would always be free to comply voluntarily with a legislative request for information. The question before the court is whether he *must* comply even if he would prefer not to. The answer to that question depends on whether there is a remedy for his failure to comply—in other words, whether the legislature has some means of compulsion. Indeed, as a purely linguistic matter, it is difficult to understand what the phrase "immune from compliance" could mean except "immune from compulsion." As the majority concedes, the only means of compulsion available to the defendant in the present case is the threat of recommending an article of impeachment. As the majority also implicitly concedes, this court has no power either to authorize the defendant to carry out that threat or to enjoin it from doing so. It is clear, therefore, that the plaintiff's claim is moot. Accordingly, I dissent.

ZARELLA, J., with whom SULLIVAN, C. J., joins, dissenting. When the constitution clearly commits a function to the legislative branch, "[w]e must resist the temptation . . . to enhance our own constitutional authority by trespassing upon an area clearly reserved as the prerogative of a coordinate branch of government." (Internal quotation marks omitted.) *Nielsen* v. *State*, 236 Conn. 1, 10, 670 A.2d 1288 (1996). Because I believe that the majority has succumbed to that temptation in the present case, I dissent. The majority today

eviscerates the political question doctrine, which has, in the past, effectively protected both the executive and legislative branches from unwarranted interference by the judiciary.[1] This court repeatedly has recognized that, "[a]lthough it is widely assumed that the judiciary, as ultimate arbiter of the meaning of constitutional provisions, must determine every constitutional claim presented and provide appropriate relief, some constitutional commands fall outside the conditions and purposes that circumscribe judicial action." (Internal quotation marks omitted.) Id., 8–9. We also have recognized that when a plaintiff has "raised a claim that inextricably presents a political question not amenable to judicial resolution and . . . seeks relief that a court cannot provide without an impermissible intrusion upon the prerogatives and functions of the coordinate branches of government," the claim is nonjusticiable. Id., 9.

I begin by addressing the mootness issue. As the majority recognizes, because the defendant committee has represented that it would not seek to enforce the subpoena through contempt proceedings or a capias, the only consequence to the governor of his refusal to comply with the subpoena would be impeachment on that ground. The majority concludes that the governor's appeal is not moot only because of that potential collateral consequence. Thus, the sole issue before the court is whether the defendant constitutionally may issue a subpoena to the governor when the subpoena is

---

[1] In our preliminary dissenting opinion in this case, Chief Justice Sullivan and I stated that we believed that this case should be dismissed as premature under the speech or debate clause of our state constitution and under the separation of powers doctrine. See *Office of the Governor* v. *Select Committee of Inquiry*, 269 Conn. 850, 853, 850 A.2d 181 (2004) (*Sullivan, C. J.*, and *Zarella, J.*, dissenting). I continue to believe that the case should be dismissed as premature. Upon further reflection, however, I now believe that this case should be dismissed for the more basic reason that it presents a nonjusticiable political question.

enforceable only by the threat of impeachment. Whether the legislature constitutionally may arrest the governor if he refuses to comply with the subpoena and compel his attendance before the defendant, and whether the courts may enforce the subpoena in contempt proceedings, are not at issue. In my view, the mere issuance of the subpoena does not constitute a harm to the governor sufficient to invoke judicial review,[2] and the threat of impeachment if the governor refuses to comply does not permit the courts to intervene because it involves a political question that is purely within the legislative sphere.

"Chief Justice Marshall proclaimed two centuries ago [that] . . . '[i]t is emphatically the province and duty

---

[2] In the majority's mootness analysis, the majority concludes that the governor's appeal is not moot and is ripe for review because he may be subject to the collateral consequence of impeachment if he refuses to comply with the subpoena. The majority also concludes that the appeal is reviewable because, if a separation of powers violation occurred at all, it occurred when the defendant issued the subpoena. If that is the case, however, then the majority need not invoke the collateral consequence rule to conclude that the appeal is not moot; in its view, the mere existence of the subpoena colorably constitutes an ongoing injury to the governor justifying intervention by the judiciary.

I do not agree that the mere issuance of the subpoena constitutes such an injury. See *United States* v. *House of Representatives of the United States*, 556 F. Sup. 150, 152–53 (D.D.C. 1983) (*House of Representatives*) (courts will not intervene in dispute between Congress and executive branch regarding legislative subpoena before Congress attempts to enforce subpoena in contempt proceedings); cf. *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (court considered legality of legislative subpoena compelling president to deliver certain materials in context of *enforcement* proceeding and affirmed dismissal of enforcement proceeding because legislative committee did not have sufficient need for requested materials). I cannot fathom how the mere issuance of a subpoena, which the executive branch is determined to ignore and which the legislature has not attempted to enforce through contempt proceedings or a capias, could interfere with executive functions. If the rule adopted by the court in *House of Representatives* does not apply in the present case, it is only because this case involves the threat of impeachment. Thus, properly understood, the issue before this court is whether the legislature constitutionally may issue a subpoena to the governor that it seeks to enforce through the threat of impeachment.

of the judicial department to say what the law is.' *Marbury* v. *Madison*, [5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803)]. Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. . . . Such questions are said to be 'nonjusticiable,' or 'political questions.' " (Citations omitted.) *Vieth* v. *Jubelirer*, 541 U.S. 267, 277, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004) (plurality opinion). In *Baker* v. *Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), the United States Supreme Court held that a question is nonjusticiable when there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id., 217.

Applying this standard, the majority concludes that this case does not present a nonjusticiable political question because this court held in *Kinsella* v. *Jaekle*, 192 Conn. 704, 721, 475 A.2d 243 (1984), that, although impeachment is a legislative function, judicial intervention in impeachment related proceedings is permitted in certain limited circumstances. See footnote 22 of the majority opinion. I disagree with the majority's characterization of the holding in *Kinsella*. In *Kinsella*, this court held that the legislature had exclusive jurisdiction over an investigation to consider the institution of

impeachment proceedings against the plaintiff, an elected probate judge, and that the trial court, therefore, should have dismissed the plaintiff's complaint, in which the plaintiff alleged that the impeachment investigation procedures adopted by the legislature were unconstitutional. *Kinsella* v. *Jaekle*, supra, 731. This court did state in dictum, however, that, in carrying out its impeachment duties, the legislature could not "ignore individual rights with impunity"; id., 727; and that, if the legislature committed acts that constituted "egregious and otherwise irreparable violations of constitutional guarantees," such acts would be subject to judicial review. Id., 726. I agree that this court has jurisdiction to adjudicate individual rights. If the legislature were, for example, to imprison the subject of impeachment proceedings for his refusal to testify, I believe that this court would have jurisdiction over a constitutional challenge to that act. To the extent that we suggested in *Kinsella* that there may be circumstances under which this court would have jurisdiction to determine the legality of an impeachment itself,[3] however, I dis-

---

[3] This court stated in *Kinsella* that the plaintiff's action was premature because "[a]ny harm, as claimed by the plaintiff, to his liberty interest in his reputation or his occupational pursuit hinges on whether the House of Representatives presents articles of impeachment and whether the Senate convicts him." *Kinsella* v. *Jaekle*, supra, 192 Conn. 728. Thus, we suggested that, *after* articles of impeachment had been adopted, this court could review the constitutionality of the impeachment process. See id. I disagree. Any infringement of the plaintiff's liberty interest that occurred during the process could not be remedied at that point and would, therefore, be moot. Any injury caused by the impeachment itself would, as the majority in the present case concedes, be nonjusticiable. See footnote 21 of the majority opinion ("[I]f the governor were required to wait until an article of impeachment was issued against him, and the governor challenged that issuance in court, then the court would be required to evaluate a discretionary function of the House, namely, the substantive grounds on which the article of impeachment was based. Such a scenario undoubtedly would pose issues of nonjusticiability."). Thus, the majority itself disavows the suggestion in *Kinsella* that an impeachment would be reviewable, a conclusion that I agree with for all of the reasons set forth in this opinion. Accordingly, in the absence of a claim that a legislative body is currently and egregiously violating the liberty or property rights of the subject of impeachment pro-

agree. I also believe that that is the only question implicated by the governor's claim in the present case. Accordingly, I would conclude that the case presents a nonjusticiable political question.

In *Kinsella*, this court recognized that the Connecticut constitution adopted by the constitutional convention in 1818 "unequivocally commits the power of impeachment and removal from elected office to the General Assembly." Id., 713; see Conn. Const., art. IX, §§ 1 and 2.[4] We also noted that "[t]he records of the constitutional convention of 1818 do not explain the framers' reasons for doing so." *Kinsella* v. *Jaekle*, supra, 192 Conn. 717. Consequently, we looked to "the impeachment and removal power's history and . . . the words of the framers of the United States constitution" to inform our understanding of our state constitution's impeachment provisions. Id., 717–18.

This history instructs us that the impeachment power is quintessentially political. As one scholar has stated, "[f]ederalists viewed impeachments as inherently political in nature and hence committed to the complete discretion of the most political branch, the legislature."

ceedings, I believe that claims challenging the legality of such proceedings are nonjusticiable. As I have indicated, I do not believe that the governor has raised a colorable claim of a current and egregious constitutional injury in the present case. See footnote 2 of this opinion.

[4] The constitution of Connecticut, article ninth, § 1, provides: "The house of representatives shall have the sole power of impeaching."

The constitution of Connecticut, article ninth, § 2, provides in relevant part: "All impeachments shall be tried by the senate. . . ."

It is interesting to note that article fourth, § 18, of the Connecticut constitution, as amended by article twenty-two of the amendments, provides in relevant part that "[t]he supreme court shall have original and exclusive jurisdiction to adjudicate disputes or questions arising under this section." Article fourth, § 18, deals specifically with the transfer of the governor's authority, powers and duties to the lieutenant governor in cases of the governor's death, resignation, refusal to serve, impeachment or incapacity. In contrast, article ninth, § 2, contains no provision for the involvement of the judiciary in the adjudication of disputes arising from impeachment.

R. Pushaw, "Justiciability and Separation of Powers: A Neo-Federalist Approach," 81 Cornell L. Rev. 393, 429 n.166 (1996). In support of this statement, Professor Pushaw cites Alexander Hamilton's view that impeachments should be left to the Congress because they "may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself."[5] The Federalist No. 65, p. 396 (Alexander Hamilton) (Clinton Rossiter ed., 1961); see also 1 L. Tribe, American Constitutional Law (3d Ed. 2000) § 2-7, pp. 152–53 (constitutional language delegating to Congress sole power over impeachment proceedings and role of impeachment as "ultimate legislative check on the other two branches [of government]" have removed impeachment process from judicial review); R. Pushaw, supra, 429 n.166, citing 2 J. Story, Commentaries on the Constitution of the United States (1833) §§ 744 through 745, 748, 762 through 764, 783, 795, 798, 801, pp. 217–19, 220–21, 233–37, 252–53, 264–65, 268–69, 271–72,[6] 1 The Works of James Wilson (R. McCloskey

---

[5] This statement by Alexander Hamilton also was cited by this court in *Kinsella* in support of its conclusion that, "although the [impeachment] process is obviously adjudicative, and the sanctions imposed inescapably penal, [the process] is not a purely judicial function." *Kinsella* v. *Jaekle*, supra, 192 Conn. 720. Rather, the "true nature of impeachment and removal"; id.; is political. Id., 721.

[6] United States Supreme Court Justice Joseph Story wrote that "[t]he offences, to which the power of impeachment has been, and is ordinarily applied, as a remedy, are of a political character. Not but that crimes of a strictly legal character fall within the scope of the power, (for, as we shall presently see, treason, bribery, and other high crimes and misdemeanours are expressly within it;) but that it has a more enlarged operation, and reaches, what are aptly termed, political offences, growing out of personal misconduct, or gross neglect, or usurpation, or habitual disregard of the public interests, in the discharge of the duties of political office. These are so various in their character, and so indefinable in their actual involutions, that it is almost impossible to provide systematically for them by positive law. They must be examined upon very broad and comprehensive principles of public policy and duty. They must be judged of by the habits, and rules, and principles of diplomacy, of departmental operations and arrangements, of parliamentary practice, of executive customs and negotiations, of foreign, as well as of domestic political movements; and in short, by a great variety

ed., 1967) pp. 324, 399, and M. Gerhardt, "Rediscovering Nonjusticiablity: Judicial Review of Impeachments After *Nixon*," 44 Duke L.J. 231, 255–57 (1994).

In *Nixon* v. *United States*, 506 U.S. 224, 233, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993), the United States Supreme Court noted that the framers had considered multiple proposals to delegate the impeachment power to the federal judiciary, but ultimately rejected those proposals and delegated the power solely to Congress. The court identified several reasons that the framers had done so. First, the framers believed that "the Senate was the 'most fit depositary of the important trust' [i.e., the sole power to try impeachments] because its Members are representatives of the people." Id., quoting The Federalist No. 65 (Alexander Hamilton).[7] Second, the

of circumstances, as well those, which aggravate, as those, which extenuate, or justify the offensive acts, which do not properly belong to the judicial character in the ordinary administration of justice, and are far removed from the reach of municipal jurisprudence. They are duties, which are easily understood by statesmen, and are rarely known to judges. A tribunal, composed of the former, would therefore be far more competent, in point of intelligence and ability, than the latter, for the discharge of the functions, all other circumstances being equal. And surely, in such grave affairs, the competency of the tribunal to discharge the duties in the best manner is an indispensable qualification." 2 J. Story, supra, § 762, pp. 233–34.

[7] Justice Story shared this view. He wrote: "[T]he very functions, involving political interests and connexions, are precisely those, which it seems most important to exclude from the cognizance and participation of the judges of the Supreme Court. Much of the reverence and respect, belonging to the judicial character, arise from the belief, that the tribunal is impartial, as well as enlightened; just, as well as searching. It is of very great consequence, that judges should not only be, in fact, above all exception in this respect; but that they should be generally believed to be so. They should not only be pure; but, if possible, above suspicion. Many of the offences, which will be charged against public men, will be generated by the heats and animosities of party; and the very circumstances, that judges should be called to sit, as umpires, in the controversies of party, would inevitably involve them in the common odium of partizans, and place them in public opinion, if not in fact, at least inform, in the array on one side, or the other. The habits, too, arising from such functions, will lead them to take a more ardent part in public discussions, and in the vindication of their own political decisions, than seems desirable for those, who are daily called upon to decide upon the private rights and claims of men, distinguished for their political conse-

framers believed that the Senate was a more appropriate body than the judiciary to try impeachments because they " 'doubted whether the members of that tribunal would, at all times, be endowed with so eminent a portion of fortitude as would be called for in the execution of so difficult a task' or whether the [Supreme] Court 'would possess the degree of credit and authority' to carry out its judgment if it conflicted with the accusation brought by the Legislature—the people's representative." *Nixon* v. *United States*, supra, 233–34, quoting The Federalist No. 65. Third, the framers believed that the Supreme Court was too small a body to conduct an impeachment. *Nixon* v. *United States*, supra, 234. " 'The awful discretion, which a court of impeachments must necessarily have, to doom to honor or to infamy the most confidential and the most distinguished characters of the community, forbids the commitment of the trust to a small number of persons.' " Id., quoting The Federalist No. 65. Fourth, the framers recognized that misconduct that results in impeach-

---

quence, zeal, or activity, in the ranks of party. In a free government, like ours, there is a peculiar propriety in withdrawing, as much as possible, all judicial functionaries from the contests of mere party strife. With all their efforts to avoid them, from the free intercourse, and constant changes in a republican government, both of men and measures, there is, at all times, the most imminent danger, that all classes of society will be drawn into the vortex of politics. Whatever shall have a tendency to secure, in tribunals of justice, a spirit of moderation and exclusive devotion to juridical duties of inestimable value. What can more surely advance this object, than the exemption of them from all participation in, and control over, the acts of political men in their official duties? Where, indeed, those acts fall within the character of known crimes at common law, or by positive statute, there is little difficulty in the duty, because the rule is known, and equally applies to all persons in and out of office; and the facts are to be tried by a jury, according to the habitual course of investigation in common cases. . . . [F]rom [the cases involving impeachments for political offenses] 'it is apparent, how little the ordinary tribunals are calculated to take cognizance of such offences, or to investigate and reform the general polity of the state.' " 2 J. Story, supra, § 764, pp. 236–37.

ment also would likely result in a criminal proceeding, and, if the court presided over the impeachment proceeding, it potentially could be biased in the criminal proceeding.[8] *Nixon* v. *United States*, supra, 234.

In light of this history, the court in *Nixon* deemed nonjusticiable the claim of the petitioner, a former United States District Court judge, that a rule adopted by the United States Senate, which allowed a committee of senators to receive evidence offered against an individual who has been impeached and to report that evidence to the full Senate, violated the impeachment trial clause of the federal constitution. Id., 227, 238; see U.S. Const., art. I, § 3, cl. 6. As Professor Pushaw notes, this is one of the very few questions that the United States Supreme Court has deemed to be purely political. R. Pushaw, supra, 81 Cornell L. Rev. 499; see also *Vieth* v. *Jubelirer*, supra, 541 U.S. 281 (plurality opinion) (political gerrymandering claims are nonjusticiable); *Gillian* v. *Morgan*, 413 U.S. 1, 7, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973) (constitution leaves military training and procedures entirely to legislative and executive branches); *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U.S. 118, 149, 32 S. Ct. 224, 56 L. Ed. 377 (1912) (claims arising under guaranty clause of article IV, § 4, of United States constitution are nonjusticiable); cf. *Schieffelin & Co.* v. *Dept. of Liquor Control*, 194 Conn. 165, 185, 479 A.2d 1191 (1984) (only remedy for violation of procedural rules of state Senate is political); *State* v. *Sitka*, 11 Conn. App. 342, 346–47, 527 A.2d 265 (1987) (claim that state Senate violated its own procedures does not present state constitutional question subject to judicial review).

---

[8] The court in *Nixon* also noted that, in impeachment proceedings against a member of the judicial branch, judicial review would be "counterintuitive because it . . . would place final reviewing authority with respect to impeachments in the hands of the same body that the impeachment process is meant to regulate." (Citation omitted.) *Nixon* v. *United States*, supra, 506 U.S. 235.

It was in recognition of the essentially political nature of impeachment that the judiciary committee of the United States House of Representatives concluded, during its investigation of alleged wrongdoings by President Richard M. Nixon, that impeachment was the *sole* remedy for the president's refusal to comply with certain subpoenas; see Judiciary Committee, House of Representatives, Impeachment of Richard M. Nixon, President of the United States, H.R. Rep. No. 93-1305 (1974) p. 4 (H.R. Rep. No. 93-1305); and that "it would be inappropriate to seek the aid of the courts to enforce its subpoenas against the President." Id., p. 210. The committee's analysis of this issue is worth quoting at length.

"The impeachment power is explicitly vested in the House of Representatives by the Constitution; its use necessarily involves the exercise of discretion by the House. While it is true that the courts may on occasion act as an umpire between Congress and the President, there are also many issues where the courts will decline to intervene because the question is one that has been constitutionally submitted to another branch.

\* \* \*

"Litigation on the Committee's subpoenas would appear to be nonjusticiable on the basis of at least three of the criteria enumerated in *Baker* v. *Carr* [supra, 369 U.S. 186]. First, there is no question that there is a 'textually demonstrable constitutional commitment of the issue'—the extent of the power of inquiry in an impeachment proceeding—to the House of Representatives. Second, if a court were to resolve the question independently, it could not escape 'expressing lack of the respect due [a] coordinate [branch] of government.' Third, there is a significant 'potentiality of embarrassment from multifarious pronouncements by various departments on one question.'

"In deciding upon the validity of subpoenas in an impeachment inquiry, the court would necessarily have to determine whether the subpoenaed material was reasonably relevant to the inquiry. This, in turn, would lead it to pass, at least implicitly, on the scope of constitutional grounds for impeachment. While it may be argued that any judicial determination of the scope of impeachable offenses would not be binding upon either the House or the Senate in deciding whether to impeach or convict after trial, there is an obvious potential for conflict between 'various departments on one question.' Inevitably, there would be a serious impairment of the confidence of the people in the legitimacy of the impeachment process if the court's definition varied from those adopted by the House or the Senate in any significant respect.

"The courts, moreover, do not have adequate means for enforcing a decision with respect to the validity of the subpoenas. The usual means of court enforcement, contempt, would be unavailing against a defiant President. The court would have to rely on impeachment to deal with noncompliance with its order requiring the President to surrender material in accordance with the subpoenas.

"An asserted advantage of a court decision affirming the validity of the subpoenas is that it would be an independent determination by an entity with no interest in the proceedings. But the impeachment process itself provides an opportunity for such a determination— initially by the House in deciding whether to prosecute the Article of Impeachment,[9] and, ultimately, by the

[9] In the present case, the defendant has not determined that the failure of the governor to honor the subpoena would categorically result in a recommendation of impeachment. Even if the defendant did recommend such action, it is merely speculative as to whether the state House of Representatives would adopt an article of impeachment. Thus, although I maintain that it is within the exclusive domain of the House to determine whether the governor's failure to comply is an impeachable offense under the circumstances of this case, it also is premature for the court to determine the issue.

Senate, the tribunal for an impeachment trial. Neither the Committee nor the House would be the final judge of the validity of the Committee's subpoenas. Whether noncompliance with the subpoenas is a ground for impeachment would ultimately be adjudicated in the Senate.

"Unless noncompliance is a ground for impeachment, there is no practical way to compel the President to produce the evidence that is necessary for an impeachment inquiry into his conduct, nor any means of assuring that the extent of the House's power of inquiry in an impeachment proceeding may be adjudicated and clarified. In the unique case of subpoenas directed to an incumbent President, a House adjudication of contempt would be an empty and inappropriate formality. As the Supreme Court said in *United States* v. *Nixon,* [418 U.S. 683, 691, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974)] in refusing to require a contempt citation against the President before the matter could be appealed, 'the [traditional] contempt avenue . . . is peculiarly inappropriate due to the unique setting in which the question arises.' " H.R. Rep. No. 93-1305, supra, pp. 211–12.

More recently, one commentator has drawn similar conclusions in an article in which he argues that Congress does not have the power to bring criminal contempt proceedings against a president for his failure to comply with a legislative subpoena. See T. Peterson, "Prosecuting Executive Branch Officials for Contempt of Congress," 66 N.Y.U. L. Rev. 563, 626 (1991). Professor Peterson argues that, because "courts are ill-equipped to resolve executive privilege disputes and the political process is a better mechanism for accommodating this particular type of constitutional conflict . . . Congress *simply has no need* for this type of sanction and can rely on the political process to protect itself. Careful consideration of the mechanics of congressional inquiries . . . reveals both that Congress

has adequate political powers to obtain the documents it needs, and that the political process balances legislative and executive interests in individual cases more adeptly than would the courts." (Emphasis added.) Id. "[E]ven if the parties reach an initial impasse and a congressional subpoena is ignored pursuant to presidential order, Congress is not without weapons that will aid it in obtaining the [information]. Once a dispute reaches the subpoena level, the press becomes a major factor in the political conflict. Past experience suggests that Congress can use the press as a substantial weapon to obtain requested [information]. As long as the need to uncover information within the executive branch has appeared legitimate, the press has been sympathetic to [the] interests [of Congress] and quite skeptical of claims of executive privilege." Id., 628–29.

Addressing the argument that such pressures might not be adequate when the president's own conduct is questioned, Peterson agreed that "Congress must have an additional weapon to obtain the documents. The political process alone would be insufficient. Congress, however, already has such a weapon: the power of impeachment.[10] If the dispute involves potential miscon-

[10] The majority disagrees "with [my] suggestion . . . that the political pressure to testify would be sufficient to elicit the requisite testimony from a governor, without the need for a subpoena or judicial intervention validating the subpoena" because that did not happen in this case. Footnote 23 of the majority opinion. I do not maintain, however, that political pressure always will be sufficient to force a chief executive to testify in impeachment proceedings. I maintain only that, if it is not, impeachment is the sole remedy and that remedy is within the exclusive jurisdiction of the legislature. The majority fails to recognize that, in the present case, the governor refused to testify up until the time that this court issued its preliminary decision because he maintained that the subpoena was invalid and hoped that this court would endorse that position, thereby reducing the political pressure to testify. When the court determined that the subpoena was valid and the governor was faced with a choice between testifying or the possibility of being impeached for his refusal to testify, he resigned. If the majority had determined that the plaintiff's claim was nonjusticiable, the governor would have been faced with the same choice, albeit without the additional political pressure for impeachment that this court's preliminary decision generated.

duct of the President and if the President is willing to risk an extended executive privilege dispute, then it is likely that the potential misconduct is of a magnitude that may implicate the impeachment process. Once the impeachment process has commenced, Congress has plenary power. It is generally recognized that executive privilege will not shield a President from producing documents relating to an impeachment inquiry. Presidential refusal to comply with a request for production of documents by a congressional committee investigating potential impeachment may itself become a ground for impeachment, as was the case with President Nixon." Id., 630.

Thus, although Peterson accepts the premise, on which the defendant relies in the present case, that, under our system of law, the executive privilege cannot be invoked to shield the chief executive from a legislative request for information relating to his misconduct, Peterson argues that impeachment was intended to be the *sole* sanction for nondisclosure. He notes that "history provides some affirmative evidence that members of Congress believed they had no sanction [for a chief executive's refusal to produce subpoenaed documents] *other than the ultimate power of impeachment,* and additional evidence by implication that Congress did not believe contempt to be within its powers." (Emphasis added.) Id., 624. "[I]n the [congressional] debates concerning presidential disclosure of executive branch information there is no recorded instance of any discussion of the use of such contempt sanctions." Id., citing 9 Annals of Cong. (1807) pp. 337–52, and 4 Annals of Cong. (1796) pp. 426–83. "Indeed, when Congress claimed an absolute right to the documents, it stopped short of asserting the power to impose contempt sanc-

---

As the Chief Justice notes in his dissenting opinion, that additional political pressure was the only effect of the majority's decision. See footnote 4 of the Chief Justice's dissenting opinion.

tions and claimed only the power of impeachment." T. Peterson, supra, 66 N.Y.U. L. Rev. 624. "For example, in [an] investigation during the . . . administration [of President John Tyler], the House of Representatives asserted that the power of impeachment included the power to compel production of documents. It concluded that the President should not be able to assert executive privilege, but claimed only the ultimate sanction of impeachment, and not the right to impose any criminal sanctions on executive officials." Id., 624 n.342.

I recognize that Peterson focuses on the impropriety of Congress' use of the sanction of contempt as a tool for obtaining information from the executive branch and does not directly address the issue before us in the present case, namely, whether the legislature constitutionally may use the threat of impeachment to enforce any demand for information from the chief executive relating to his wrongdoing. Instead, Peterson simply assumes that that is the case. In my view, that assumption is well founded in light of Peterson's persuasive argument that disputes between Congress and the president over congressional requests for information should be resolved through the political process and that Congress has plenary power over impeachment proceedings. If Congress cannot enlist the courts in an attempt to enforce a subpoena through contempt proceedings, then the president should not be able to seek judicial validation of his position that an impeachment threat is unwarranted.[11] The same political pressures that ensure that the president cannot ignore congressional demands

---

[11] Arguably, the threat of a capias, which, under our statutes, does not require the intervention of the courts; see General Statutes § 2-46 (certain members of General Assembly "shall have the power to compel the attendance and testimony of witnesses by subpoena and capias issued by any of them"); might be a sufficiently egregious interference with the function of the executive branch that the governor should be able to seek the intervention of the courts to enjoin it. As I have noted, however, there is no threat of a capias in the present case.

for information with impunity protect the president from being impeached on the basis of noncompliance with unreasonable demands for information.

With these authorities in mind, I would conclude that the present case satisfies at least four of the criteria for nonjusticiability set forth in *Baker* v. *Carr*, supra, 369 U.S. 217. First, there clearly is "a textually demonstrable constitutional commitment of the issue to a coordinate political department . . . ."[12] Id.; see *Nixon* v. *United States*, supra, 506 U.S. 229–36 (concluding that impeachment power is textually committed to Congress); *Kinsella* v. *Jaekle*, supra, 192 Conn. 713 ("the [state] constitution unequivocally commits the power of impeachment and removal from elected office to the General Assembly"). Indeed, there are few, if any, constitutional provisions that more clearly commit an issue to a single branch of government than our state

---

[12] The majority concludes that "there has been no constitutional commitment of the impeachment authority to the legislature such that judicial review of the plaintiff's challenge is rendered inappropriate." Laying the groundwork for this conclusion, the majority first "recasts" this court's determination in *Kinsella* that a claim arising from the legislature's exercise of the impeachment power is justiciable only when the plaintiff has alleged that the legislature is "violating his rights in an egregious way that cannot be repaired"; *Kinsella* v. *Jaekle*, supra, 192 Conn. 728; and then concludes that "the appropriate standard by which to determine whether judicial review of the legislative exercise of the impeachment authority in connection with a sitting governor is warranted is whether the plaintiff has asserted, in good faith, a colorable claim of a constitutional violation." In support of recasting the court's determination in *Kinsella*, the majority claims that, unlike the due process violations alleged in that case, "action by one branch of government that violates the separation of powers is, in and of itself, a harm, in that the branch whose sphere of authority has been encroached upon has neither remained independent nor free from the risk of control, interference or intimidation by other branches." As I have indicated, I do not agree with that conclusion, which is contradicted by relevant federal case law. Finally, I would note that, if the impeachment power is not "textually committed" to the legislature for purposes of justiciability analysis, it is difficult to conceive of any matter that is textually committed to another branch of government. Thus, the majority's analysis eviscerates the political question doctrine.

constitution's impeachment provisions. See Conn. Const., art. IX, §§ 1 and 2. Moreover, as we recognized in *Kinsella*, the preliminary investigatory power of a legislative committee is "squarely within the legislature's jurisdiction under [those provisions]." *Kinsella* v. *Jaekle*, supra, 723.

Second, there is "a lack of judicially discoverable and manageable standards for resolving" the issue raised by the governor. *Baker* v. *Carr*, supra, 369 U.S. 217. As I have indicated, the issue before this court is whether the defendant may issue a subpoena to the governor that it seeks to enforce through the threat of impeachment. Traditionally, courts assessing the validity of a legislative subpoena directed to the chief executive balance the legislature's need for the information against the intrusion on the executive branch that compliance with the subpoena will occasion. See *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (*Senate Select Committee*) (information sought in legislative subpoena must be "demonstrably critical to the responsible fulfillment of the Committee's functions");[13] see also *Nixon* v. *Sirica*, 487 F.2d 700, 717–18 (D.C. Cir. 1973) (grand jury's need for information in criminal case outweighed president's interest in confidentiality); *Halperin* v. *Kissinger*, 401 F. Sup. 272, 275 (D.D.C. 1975) (plaintiff's need for former president's testimony in civil case outweighed for-

---

[13] In *Senate Select Committee*, the court determined that the legislative committee's need for the information that it sought from the president must be weighed against the president's interest in confidentiality. See *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, supra, 498 F.2d 730–31. In the present case, the governor's primary argument is that compliance with the subpoena would interfere with the performance of his constitutional duties. He does not rely on a claim of executive privilege. By analogy to *Senate Select Committee*, however, it seems clear that the defendant's need for information should be weighed against the governor's interest in precluding any interference with the performance of his official duties.

mer president's interest in confidentiality when he was "uniquely capable of clarifying certain . . . issues"). Thus, in the present case, in order to assess the defendant's need for the information it seeks, the courts either must (1) defer to the legislature's determination that it has a critical need for the governor's testimony concerning his suspected wrongdoings, regardless of the nature of the wrongdoings or the evidence thereof— which would be tantamount to conceding that there are no "judicially discoverable and manageable standards for resolving [the issue]"; *Baker* v. *Carr*, supra, 217—or (2) evaluate the substance of the demand for testimony, which would entangle the courts in the impeachment process, a matter that is inherently beyond their purview.[14] See H.R. Rep. No. 93-1305, supra, p. 212 (judicial review of judiciary committee's subpoena to president was inappropriate because "the court would necessarily have to determine whether the

---

[14] The majority concludes that "[t]here are no special impediments to our ascertainment and application of the standards by which to resolve this challenge; indeed, the matter raises questions of constitutional interpretation that, for more than two centuries, regularly have been reserved for the judiciary." The majority also appears to have concluded that it need not review the substance of the defendant's subpoena but simply should defer to the legislature's determination that the requested information is needed. It apparently bases this determination on "the great importance of the impeachment process under our constitution" and on its conclusion—unsupported by any citation to the record—that compliance with the subpoena will not place undue burdens on the governor's time and attention. Thus, the "questions of constitutional interpretation" that the majority believes this court is competent to answer are: (1) the importance of the impeachment process, a process constitutionally committed solely to the legislature; and (2) what constitutes undue interference with the chief executive. The issue before the court, however, is not whether the impeachment process is important, but whether the governor's testimony is necessary for the defendant's responsible performance of its impeachment related functions. In failing to address that narrow issue, the majority implicitly holds that virtually *any* legislative demand for information in the context of an impeachment proceeding is valid, at least as long as it is not "utterly offensive and irrelevant"; footnote 32 of the majority opinion; and that the only check on the legislature is political. If that is the case, however, then the entire issue is a nonjusticiable political question.

subpoenaed material was reasonably relevant to the inquiry . . . [which], in turn, would lead it to pass, at least implicitly, on the scope of constitutional grounds for impeachment"). As the court in *Nixon* v. *United States,* supra, 506 U.S. 224, stated, "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." Id., 228–29. I believe that this principle applies in the present case. The fact that the courts of this state never have developed standards for evaluating the need for evidence in impeachment proceedings itself suggests that it involves a purely legislative function. Cf. 1 L. Tribe, supra, § 2-7, p. 152 ("[a]lthough the impeachment process has been used periodically since 1789, there has been no judicial attempt to define its limits").

Third, the courts cannot resolve the issue raised in this appeal "without expressing lack of the respect due coordinate branches of government . . . ." *Baker* v. *Carr,* supra, 369 U.S. 217. The defendant has determined that it needs the governor's testimony to carry out its impeachment related duties in a responsible manner. In my view, that determination is well within the core of the impeachment power, which, as I have indicated, is solely committed to the legislature. I believe that a court demonstrates a lack of respect for the legislative branch by taking the position that judicial validation of the defendant's determination is required in order to protect the legitimacy of the impeachment process. Such a position suggests that the legislature, in contrast to the judiciary, is incapable of determining, intelligently and in good faith, whether the governor's noncompliance with the subpoena is a proper ground for impeachment.

Finally, judicial resolution of this issue entails "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id. If, for example, this court had determined that the issuance of the subpoena unconstitutionally interfered with the governor's performance of his executive duties, the defendant nevertheless could have recommended the drafting of an article of impeachment on the basis of the governor's refusal to comply.[15] Thus, it is clear that the court's opinion as to the constitutionality of the subpoena is merely advisory.

I would conclude that the courts lack jurisdiction over this case because it presents a nonjusticiable political question. Accordingly, I dissent.

---

[15] As I have indicated, even the majority recognizes that the substantive grounds for an article of impeachment are not subject to review by this court. See footnote 21 of the majority opinion.